1  Ben M. Harrington (SBN 313877)
2  **HAGENS BERMAN SOBOL SHAPIRO LLP**
   715 Hearst Avenue, Suite 300
3  Berkeley, CA 94710
   Telephone: (510) 725-3000
4  benh@hbsslaw.com

5  Catherine Y.N. Gannon (pro hac vice forthcoming)
6  **HAGENS BERMAN SOBOL SHAPIRO LLP**
   1301 Second Avenue, Suite 2000
7  Seattle, WA 98101
   Telephone: (206) 623-7292
8  catherineg@hbsslaw.com

9  *Attorneys for Plaintiffs and the Proposed Class*

10

11              **UNITED STATES DISTRICT COURT**
12              **NORTHERN DISTRICT OF CALIFORNIA**

13  ADAM ALZAIDI, DWIGHT CHORNOMUD,         Case No. _____
    and MELISSA CUEVAS, individually and on
14  behalf of all others similarly situated,        **CLASS ACTION COMPLAINT**

15              Plaintiffs,

16        v.                                          **JURY TRIAL DEMANDED**

17  PROCTER & GAMBLE COMPANY,

18              Defendant.

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

<u>Page</u>

2

3
I.      INTRODUCTION ................................................................................................1

4
II.     JURISDICTION AND VENUE .........................................................................9

5
III.    PARTIES .............................................................................................................9

6
        A.      Plaintiffs .................................................................................................9

7
                1.      Adam Alzaidi ..............................................................................9

8
                2.      Dwight Chornomud ...................................................................10

9
                3.      Melissa Cuevas .........................................................................11

10
        B.      Defendant ..............................................................................................12

11
                1.      Procter & Gamble Company .....................................................12

12
IV.     FACTUAL ALLEGATIONS ............................................................................12

13
        A.      Environmental stewardship is a material attribute to consumers.............12

14
        B.      P&G knows that its environmental stewardship claims are material to

15
                consumers. .............................................................................................15

16
        C.      Companies have developed sophisticated greenwashing campaigns to
                leverage the growth opportunities in environmental claims and

17
                messaging.............................................................................................16

18
        D.      The FTC's "Green Guides" provide critical information to consumers,

19
                companies, and courts about deceptive environmental claims. ............17

20
        E.      P&G sells more than $3 billion worth of P&G Paper Products each

21
                year.......................................................................................................21

22
        F.      P&G touts its environmental stewardship via its Keep Forests as
                Forests campaign. ..................................................................................22

23
                1.      P&G displays its Protect-Grow-Restore messaging and

24
                        third-party certifications at point of sale.....................................22

25
                2.      Charmin Toilet Paper packaging includes the unqualified
                        FSC logo in a prominent location at the front of the

26
                        package. ....................................................................................24

27
                3.      Charmin Toilet Paper packaging also includes the Protect-

28
                        Grow-Restore and "Rainforest Alliance" logos.........................25

Case No. _____

4.      Puffs Tissues packaging also displays the same FSC and
        Rainforest Alliance certifications as well as P&G's Protect-
        Grow-Restore logo..................................................................................26

5.      P&G extends the exposure and reach of its Keep Forests as
        Forests campaign at digital point-of-sale locations with
        national retailers....................................................................................26

        a.      Kroger Point-of-Sale Listing for Charmin Ultra Strong
                Toilet Paper.................................................................................27

        b.      Walmart Point-of-Sale Listing for Charmin Ultra
                Strong Toilet Paper .....................................................................28

        c.      Costco Point-of-Sale Listing for Charmin Ultra Soft
                Toilet Paper.................................................................................28

        d.      Lowe's Point-of-Sale Listing for Charmin Ultra Soft
                Toilet Paper.................................................................................30

        e.      Amazon's Point-of-Sale Listing for Charmin Ultra
                Gentle Toilet Paper .....................................................................31

        f.      Puffs Tissues digital point-of-sale listings also contain
                the same logos and environmental representations.......................32

6.      P&G also directs consumers to its Sustainability Promise
        websites via its P&G Paper Products packaging. .......................................34

        a.      The "Protect" video depicts FSC-certified forests in the
                United States that are owned by small landowners who
                follow FSC responsible forest management guidance..................35

        b.      The "Grow" video prominently displays the
                unqualified FSC and "Rainforest Alliance Certified"
                logos and promises to replant at least 1-2 new trees for
                every tree used in its products.....................................................35

        c.      The "Restore" video promises that P&G will help plant
                1 million trees between 2020 and 2025 in areas
                devastated by natural disasters....................................................36

        d.      P&G also maintains an additional Sustainability
                Promise website for its Puffs Tissues products where it
                makes the same Protect-Grow-Restore environmental
                claims. .......................................................................................36

7.      P&G also produced a viral Protect-Grow-Restore YouTube
        video repeating its key promises to consumers..........................................38

G.    P&G also touts its environmental messaging and enforcement promises to investors.................................................................38

H.    P&G's Keep Forests as Forests campaign and Protect-Grow-Restore promises are misleading because of the following misrepresentations and material omissions...............................................................39

    1.    P&G's "Protect" promise misleads consumers because P&G does not disclose that P&G Paper Products are sourced from harvests that rely on devastatingly harmful industrial logging practices. ............................................39

        a.    P&G sources most of its wood pulp Canada's boreal forest, an ecological jewel and one of the last primary forests on earth........................................................39

        b.    Deforestation Practices and Forest Degradation Practices both incorporate the same industrial logging activities that devastate the health of Canada's boreal forest. ................................................................41

        c.    P&G promises "no deforestation" while also misleading consumers as to the extent of the harm caused by the Forest Degradation Practices in the P&G Paper Products supply chain. .........................................43

    2.    P&G's "Grow" promise is misleading because P&G's suppliers are systematically converting old growth forests into industrial tree crops..........................................44

    3.    P&G's "Restore" promise is misleading as P&G intends to replace less than 1% of lands harvested in Canada's boreal forests. .............................................................46

    4.    P&G also misleads consumers at point-of-sale with unauthorized and improper use of third-party logos...............46

        a.    P&G's statement that its P&G Paper Products pulp is 100% derived from FSC-certified forests is false.........................47

        b.    P&G's use of the FSC Mix logo is also misleading. ...................49

        c.    P&G continues to misuse and mislead consumers regarding its Rainforest Alliance logos and claims. ....................50

I.    P&G's Keep Forests as Forests campaign and P&G Paper Products packaging violates the FTC Green Guides. ..........................................52

J.    P&G has repeatedly promised to fulfill its promises, or to stop making misleading claims, but has failed to do so. ...........................................55

K.    P&G has actively concealed the truth about its environmental claims from consumers........................................................................................57

L.    P&G's competitors demonstrate that more sustainable practices are possible. .................................................................................................59

V.    TOLLING OF THE STATUTE OF LIMITATIONS.........................................60

A.    Discovery Rule Tolling.......................................................................60

B.    Fraudulent Concealment Tolling ......................................................61

C.    Estoppel...............................................................................................61

VI.    CLASS ALLEGATIONS ...................................................................................61

VII.    CLAIMS FOR RELIEF .....................................................................................64

A.    Claims brought on behalf of the California Class.................................64

COUNT I VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, *ET SEQ.*) ...................................64

COUNT II VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*) ...........................................66

COUNT III VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*) ...........................................67

COUNT IV FRAUDULENT CONCEALMENT (BASED ON CALIFORNIA LAW).............69

PRAYER FOR RELIEF ...............................................................................................70

DEMAND FOR JURY TRIAL ....................................................................................71

Plaintiffs Adam Alzaidi, Dwight Chornomud, and Melissa Cuevas, individually and on behalf of all others similarly situated, allege the following:

## I.    INTRODUCTION

1.      This is a consumer protection case alleging claims against one of the biggest consumer good companies in the world who, for years, has been complicit in the clearcutting of untouched ancient primary forests in order to sell billions of dollars of single-use tissue products—all the while reassuring consumers with false claims that it is committed to protecting, regrowing, and restoring these unique forests.

2.      Defendant Procter & Gamble Company[1] sources the wood pulp used in its Charmin Toilet Paper and Puffs Tissue brands[2] from the Canadian boreal forest. Canada's boreal forest is one of the last large primary forests left on Earth and represents one of the planet's most important biological ecosystems. Below is an area where P&G has sourced its Paper Products[3] via devastating industrial harvesting practices that are completely at odds with the environmental stewardship claims P&G makes to consumers at point-of-sale and elsewhere:



---

[1] "P&G" or "PGC" means Procter & Gamble Company.

[2] Charmin Toilet Paper means tissue products made by P&G under the brands Charmin Ultra Soft, Charmin Ultra Strong, Charmin Ultra Gentle, Charmin Essentials Soft, Charmin Essential Strong Puffs Tissues means tissue products made by P&G under the brands Puffs Ultra Soft & Strong, Puffs Plus Lotion, and Simple Softness or Basic brands. "P&G Paper Products" or "Paper Products" refers collectively to Charmin Toilet Paper and Puffs Tissues brands.

[3] Courtenay Lewis & Ashley Jordan, *By a Thousand Cuts: How Powerful Companies' Wood Sourcing is Degrading Canada's Boreal Forest*, NRDC (Apr. 2021), https://www.nrdc.org/sites/default/files/thousand-cuts-wood-sourcing-canadas-boreal-report.pdf.

3.      P&G manufactures a wide variety of consumer goods, including Charmin Toilet Paper and Puffs Tissues. P&G sells around $2 billion of Charmin a year and enjoys around 25% of the North American market share for toilet paper.[4] Indeed, according to U.S. Census data, more than 86 million Americans used Charmin Ultra in the year 2020 alone. Similarly, P&G sells around $1 billion of Puffs Tissues a year and the facial tissue brand is consistently among the top three brands sold in the United States.[5]

4.      P&G's success in selling billions of dollars of P&G Paper Products is due in part to its environmental stewardship claims. A large portion of consumers increasingly care about the environmental impact of products when making purchasing decisions, with many stating that they are willing to pay more for sustainable options and are prioritizing brands with environmentally conscious practices. According to a joint study by McKinsey & Company and NielsenIQ entitled "Consumers Care About Sustainability and Back it Up with Their Wallets" (hereinafter "McKinsey study"), around 60% of U.S. consumers disclosed that they care about buying environmentally and ethically sustainable products.[6] The McKinsey study also found that "a wide range of consumers across incomes, life stages, ages, races, and geographies are buying products bearing ESG[7]-related labels." Moreover, multiple studies show that consumers are even willing to pay a premium of around 9 to 12% for sustainably produced or sourced goods—even when facing inflationary and/or cost-of-living headwinds. *See* § IV.A., *infra*.

5.      In light of these trends, companies are increasingly allocating time, attention, and resources to position their products and supply chains as environmentally responsible—and P&G is no exception. More specifically, P&G devotes considerable resources to maintaining and

---

[4] *Sales of the leading 10 toilet tissue brands of the United States in 2017*, STATISTA, https://www.statista.com/statistics/188710/top-toilet-tissue-brands-in-the-united-states/.

[5] Puffs Tissues annual revenue is estimated assuming that the facial tissue market size is $5.4 billion and that Puffs retains a market share of around 15 to 20%. *Facial Tissue Paper Market*, FMI, https://www.futuremarketinsights.com/reports/facial-tissue-paper-market.

[6] *Consumers care about sustainability—and back it up with their wallets*, MCKINSEY & COMPANY (Feb. 6, 2023), https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/consumers-care-about-sustainability-and-back-it-up-with-their-wallets#/.

[7] ESG-related labels mean labels that connote a company's claims or philosophy regarding environmental, social, or governance issues.

disseminating to the public an umbrella marketing campaign entitled Keep Forests as Forests. A summary of P&G's Keep Forests as Forests campaign and main logos are displayed below:[8]




6.    A key part of the Keep Forests as Forests campaign includes the three promises P&G makes to consumers via its Protect-Grow-Restore logo. For its "Protect" promise, P&G conveys to reasonable consumers the overall impression that P&G Paper Products are environmentally sustainable in part because they are made exclusively from pulp certified by the Forest Stewardship Council ("FSC"). FSC is an international non-profit that promotes responsible management by offering a forest certification system for forests and forest products. For its "Grow" promise, P&G promises that for every tree used by P&G, at least two are regrown in its place.[9] This promise conveys to reasonable consumers the overall impression that the company is mitigating the

---

[8] *Webinar on Promoting Consumer Engagement with Forest Sustainability*, FSC INTERNATIONAL (Nov. 19, 2021), https://www.youtube.com/watch?v=BFB0J3jQlkw, at 24:34.
[9] *Friend of the Forest Award 2018 | Charmin & Arbor Day Foundation*, CHARMIN, https://youtu.be/DPMpB_ZmC4U, at 1:01 ("Grow Video").

environmental harm caused by its suppliers' harvesting of wood pulp via thoughtful and effective replanting efforts designed to replace the original biodiversity (and thus ecosystem value) of the harvested forest. For its "Restore" promise, P&G touts its partnership with the Arbor Day Foundation to plant one million trees in forests affected by natural disasters. This promise conveys to reasonable consumers the overall impression that the P&G supply chain is not only regrowing trees its own harvested areas but is *also* contributing to restoring damaged forests outside of its sourcing activities. This, in turn, implies to consumers that the purchase of a P&G Paper Product is either environmentally neutral or a net environmental benefit.

7.     Collectively speaking, the Keep Forests as Forests campaign creates an overall impression to consumers that P&G is not only committed to, but also working meaningfully toward, environmental sustainability. The Keep Forests as Forests campaign also conveys an overall impression to consumers that P&G is taking measurable steps towards actively restoring the ecosystem value of the harvested forests from which P&G sources its wood pulp, which in turn, minimizes or neutralizes the environmental harm associated with the manufacture of single-use P&G Paper Products.

8.     To reinforce the Protect-Grow-Restore promises to consumers at point-of-sale, P&G consistently includes a uniform Protect-Grow-Restore logo on all its Charmin Toilet Paper and Puffs Tissues packages in stores. *See* § IV.F.1., *infra*. It also uses the logo of third-party certifiers, like the FSC and Rainforest Alliance, who according to P&G, evaluate, support, and certify P&G's forest management practices.

9.     P&G also extends the reach of its Keep Forests as Forests and Protect-Grow-Restore messaging with consistent displays at digital points of sale. For example, P&G relies on a robust network of retailers like Kroger, Costco, Amazon, Walmart, and others to make P&G Paper Products available for sale in all 50 states and territories in store and via their online selling platforms. P&G provides these digital retailers the Protect-Grow-Restore logos and Keep Forests as Forests messages, with the expectation that they will be displayed along with the P&G Paper Products, as

P&G knows that these claims are material to consumers. Below is an example[10] of these types of representations:

**Product Details**



Get sparkly clean with Charmin Ultra Strong. Its 4X stronger when wet and has a diamond-weave texture. Its woven like a washcloth and holds up when you wipe. It even cleans better so you can use less and go longer without changing the roll. We also made it MEGA in size, so you get mega value. Thats right, our Charmin Ultra Strong Mega Roll is way bigger, equals 4 regular rolls, and its more bang for your behind so youll be running back to the store less and less (based on number of sheets in Charmin Regular Roll bath tissue). Our Charmin Ultra Strong toilet paper is also 2-ply and designed to be clog-safe and septic-safe so you can flush confidentially and keep clean. And at Charmin, we love trees so we work hard to protect, grow and restore forests. Its why all our pulp used is 100% FSC certified. Its why we plant two trees for every one used. And its why we help to restore forests devastated by natural disaster through the Arbor Day Foundation. Thats how were helping keep forests, forests. We all go, why not Enjoy The Go with Americas favorite toilet paper.

**Charmin Beyond The Roll**







**FSC™ Certified**

We only use pulp certified by the Forest Stewardship Council® and support FSC® in their work to increase adoption of FSC products. These standards ensure that we are protecting wildlife and contributing to thriving local communities.

**Protect, Grow and Restore**

At Charmin, we are committed to making our toilet paper work hard to make a sustainable difference. 100% of our paper comes from responsibly managed forests.

**Forest Restoration**

P&G and Charmin are partnering with the Arbor Day Foundation to plant 1 million trees in forests affected by natural disasters, like wildfires or hurricanes.

10.    Unfortunately, P&G's promise to Keep Forests as Forests and its commitment to Protect-Grow-Restore trees amounts to nothing more than greenwashing. Greenwashing is the act of misleading consumers regarding the environmental practices of a company or a product. Greenwashing occurs when a company positions itself (or a specific product) as having a positive

---

1    influence on environmental issues when, in reality, the company (or product) is either exaggerating

2    its influence and/or actively engaging in negative environmental practices that do not align with its

3    previously touted green goals.

4        11.    For example, P&G's "Protect" promise misleads consumers because P&G does not

5    disclose that it relies on suppliers who use industrial logging practices (such as clearcutting and

6    burning) that contribute to the harvest of more than one million acres of Canada's boreal forest per

7    year.[11] Below are some examples[12] of harvests through which P&G sources its wood pulp:

8

9

10     

11

12

13

14

15        12.    Similarly, P&G's "Grow" promise states that it replants one to two trees for every

16    tree used in P&G Paper Products. This provides the overall impression that P&G and its suppliers

17    are using thoughtful and effective replanting efforts that will eventually mimic a forest with the same

18    ecosystem value that existed before P&G's harvesting occurred. But P&G fails to disclose (and

19    actively conceals) that, in reality, its suppliers are replanting single species conifers, evenly spaced,

20    and then cover these trees with chemical herbicides to intentionally eliminate all growth other than

21    just a handful of tree species most valuable for logging.

22        13.    In other words, P&G's "Grow" efforts do very little to recreate the ecosystem value

23    of the diverse forest that was logged. Instead, P&G's suppliers simply replant the trees as they would

24    _____

25        [11] Dominick A. DellaSala et al., *Red-Listed Ecosystem Status of Interior Wetbelt and Inland Temperate Rainforest of British Columbia, Canada,* 10 *Land* 775 (2021), https://doi.org/10.3390/land10080775; Brendan Mackey et al., *Assessing the Cumulative Impacts of Forest Management on Forest Age Structure Development and Woodland Caribou Habitat in Boreal Landscapes: A Case Study from Two Canadian Provinces*, 13 *Land* 6 (2024), https://doi.org/10.3390/land13010006.

26

27        [12] *A Tale of Two Forests: A Tour Through Canada's Boreal*, NRDC (Aug. 26, 2019), https://www.nrdc.org/stories/tale-two-forests-tour-through-canadas-boreal.

28

crops on a farm—and then harvest them after only twenty years of growth (but at peak value for logging). Below are examples of some of these practices[13] and how P&G's suppliers turn old-growth forest into tree crops and tree farms:

 

14.     P&G also does not disclose that its much touted "Restore" efforts will never meaningfully restore the ecosystem value that was destroyed via its industrial logging practices, as P&G's and its partners have only committed to restoring an area amounting to less than 1% of boreal forest harvested every year in Canada.

15.     Because P&G has no true intention to restore the boreal forest areas to the same ecosystem value and level of environmental benefit that existed before P&G's harvesting (*i.e.*, Keep *the Boreal* Forest as *the Boreal* Forest), P&G's Keep Forests as Forests campaign is inherently misleading to the reasonable consumer.

16.     Moreover, P&G's use of the FSC and Rainforest Alliance logos are also misleading and erroneous. In the case of the FSC logo, P&G continues to put the unqualified FSC logo on the front of its packaging and tout that "100%" of its wood pulp is FSC-certified, even though only a small fraction of P&G's pulp is sourced from FSC-certified forests. *See* § IV.H.4., *infra*. Similarly, P&G currently displays the "Rainforest Alliance Certified" logo on its website, but this seal is now obsolete because the Rainforest Alliance ceased its certification program years ago and the third-party certifier does not even operate in Canada's boreal forest.

---

[13] *E.g.*, *The Impacts of Industrial Logging in the Great Northern Forest*, GREENPEACE (2018), https://www.greenpeace.org/static/planet4-canada-stateless/2018/07/The-Impacts-of-Logging-in-the-Great-Northern-Forest.pdf.

1    17.    All of these misleading claims and P&G's broken promises are clear violations of the

2    Green Guides. Developed by the Federal Trade Commission ("FTC"), the Green Guides are

3    designed to help marketers avoid making environmental marketing claims that are unfair or

4    deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45. The Green Guides also play a large role

5    in state consumer protection law. At least twelve states[14] have laws that directly incorporate the

6    standards set forth in the Green Guides as the legal standard for lawfully making certain marketing

7    claims[15] and twenty-seven states and territories[16] have laws designating the FTC's interpretation in

8    the Green Guides as persuasive authority for courts. As explained more fully below, P&G's Keep

9    Forests as Forests Campaign and packaging practices violate multiple sections of the FTC Green

10   Guides.

11   18.    Yet, despite P&G's clearly misleading claims and Green Guide violations, P&G

12   refuses to act to either conform its environmental practices to be consistent with what it is telling

13   consumers—or admit to its reliance on environmentally devastating activities. And while there has

14   been some activity at the shareholder level—even the descendants of the Procter and Gamble

15   families have strongly criticized P&G's practices—P&G continues to mislead consumers.

16   19.    Plaintiff brings this case as a proposed Class on behalf of herself and those similarly

17   situated seeking both injunctive relief under Rule 23(b)(2), forcing P&G to make accurate corrective

18   disclosure, and under Rule 23(b)(3) for damages.

19

20

21

22   _____

23   [14] These states are Alabama, California, Florida, Indiana, Maine, Maryland, Michigan,
     Minnesota, New Mexico, New York, Pennsylvania, Rhode Island, and Washington.

24   [15] Comments to the FTC regarding Green Guides Review from the attorneys general of
     California, Connecticut, Delaware, Illinois, Maryland, Michigan, Minnesota, New Jersey, New

25   Mexico, New York, Oregon, Rhode Island, and Wisconsin (Apr. 24, 2023),
     https://oag.ca.gov/system/files/attachments/press-docs/Comments%20to%20FTC%20re%20Green

26   %20Guides%204.24.23.pdf.
     [16] These are Alabama, Alaska, Arizona, Connecticut, District of Columbia, District of Guam,

27   Florida, Idaho, Georgia, Illinois, Maine, Maryland, Massachusetts, Michigan, Montana, New
     Hampshire, New Mexico, Ohio, South Carolina, Rhode Island, Texas Tennessee, Utah, Vermont,

28   Washington, and West Virginia.

CLASS ACTION COMPLAINT – 8                                    Case No. _____
011290-11/3201168 V1

## II.    JURISDICTION AND VENUE

20.    This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists.

21.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions and misrepresentations giving rise to Plaintiffs' claims occurred in this District. Plaintiffs Alzaidi and Chornomud purchased Charmin Toilet Paper in this District and Plaintiff Cuevas purchased both Charmin Toilet Paper and Puffs Tissues in this District. Moreover, P&G has marketed, advertised, and made available for sale Charmin Toilet Paper and Puffs Tissues within this District.

## III.    PARTIES

### A.    Plaintiffs

#### 1.    Adam Alzaidi

22.    Plaintiff Adam Alzaidi (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in Santa Rosa, California. From approximately October 2019 to January 2024, Plaintiff routinely purchased Charmin Toilet Paper from Amazon and Safeway stores in California. The labels Plaintiff saw were substantially similar to the ones included below in § IV.F. of this Complaint.

23.    Unknown to Plaintiff at the time the P&G Paper Products were purchased, Defendant's practices permanently degrade the environment as described in this Complaint. For example, none of the advertisements reviewed or representations received by Plaintiff contained any disclosure that: (1) P&G Paper Products are fundamentally unsustainable products due to P&G's heavy reliance on virgin forest fiber derived from the clearcutting and burning of Canada's boreal forest; (2) Defendant misleads consumers into thinking that P&G is committed to attaining the sustainability goals, when P&G's supply chain practices show otherwise; and (3) Defendant's statements create the misimpression that P&G's sustainability promises represent a viable method for substantially mitigating or neutralizing the harm P&G Paper Products' supply chain causes to

1   the environment, when these promises do not. Had Defendant disclosed these practices, Plaintiff

2   would not have purchased the P&G Paper Products or would have paid less for them.

3          24.    Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing,

4   and selling P&G Paper Products as environmentally neutral or beneficial has caused Plaintiff out-

5   of-pocket loss. Defendant knew that the products were not environmentally neutral or beneficial but

6   did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the

7   reasonable, but mistaken, belief that his P&G Paper Products were sustainable or environmentally

8   neutral or beneficial.

9          25.    Plaintiff intends to purchase sustainably sourced bathroom tissue in the future and

10   continues to see Charmin Toilet Paper available for purchase with substantially similar claims that

11   are at issue in this Complaint. Plaintiff desires to purchase Charmin Toilet Paper again if Plaintiff

12   can be assured that Defendant's sustainability claims were in fact true.

13          **2.    Dwight Chornomud**

14          26.    Plaintiff Dwight Chornomud (for the purposes of this paragraph, "Plaintiff") is a

15   citizen of California domiciled in Riverside, California. From approximately 2018 to 2024, Plaintiff

16   routinely purchased Charmin Toilet Paper from Costco Wholesale stores in California. The labels

17   Plaintiff saw were substantially similar to the ones included below in § IV.F. of this Complaint.

18          27.    Unknown to Plaintiff at the time his Charmin Toilet Paper was purchased,

19   Defendant's practices permanently degrade the environment as described in this Complaint. For

20   example, none of the advertisements reviewed or representations received by Plaintiff contained any

21   disclosure that: (1) P&G Paper Products are fundamentally unsustainable products due to P&G's

22   heavy reliance on virgin forest fiber derived from the clearcutting and burning of Canada's boreal

23   forest; (2) Defendant misleads consumers into thinking that P&G is committed to attaining the

24   sustainability goals, when P&G's supply chain practices show otherwise; and (3) Defendant's

25   statements create the misimpression that P&G's sustainability promises represent a viable method

26   for substantially mitigating or neutralizing the harm P&G Paper Products' supply chain causes to

27   the environment, when these promises do not. Had Defendant disclosed these practices, Plaintiff

28   would not have purchased the products or would have paid less for them.

CLASS ACTION COMPLAINT – 10                                              Case No. _____
011290-11/3201168 V1

28.    Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling P&G Paper Products as environmentally beneficial has caused Plaintiff out-of-pocket loss. Defendant knew that the products were not environmentally beneficial but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable, but mistaken, belief that his P&G Paper Product was sustainable or environmentally neutral or beneficial.

29.    Plaintiff intends to purchase sustainably sourced bathroom tissue in the future and continues to see Charmin Toilet Paper available for purchase with substantially similar claims that are at issue in this Complaint. Plaintiff desires to purchase Charmin Toilet Paper again if Plaintiff can be assured that Defendant's sustainability claims were in fact true.

**3.    Melissa Cuevas**

30.    Plaintiff Melissa Cuevas (for the purpose of this paragraph, "Plaintiff") is a citizen of California domiciled in Colton, California. From approximately 2014 to December 2024, Plaintiff routinely purchased Charmin Toilet Paper and Puffs Plus with Lotion from Walmart and Stater Brothers in California. The labels Plaintiff saw were substantially similar to the ones included below in § IV.F. of this Complaint.

31.    Unknown to Plaintiff at the time the P&G Paper Products were purchased, Defendant's practices permanently degrade the environment as described in this Complaint. For example, none of the advertisements reviewed or representations received by Plaintiff contained any disclosure that: (1) P&G Paper Products are fundamentally unsustainable products due to P&G's heavy reliance on virgin forest fiber derived from the clearcutting and burning of Canada's boreal forest; (2) Defendant misleads consumers into thinking that P&G is committed to attaining the sustainability goals, when P&G's supply chain practices show otherwise; and (3) Defendant's statements create the misimpression that P&G's sustainability promises represent a viable method for substantially mitigating or neutralizing the harm P&G Paper Products' supply chain causes to the environment, when these promises do not. Had Defendant disclosed these practices, Plaintiff would not have purchased the products or would have paid less for them.

32.    Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling P&G Paper Products as environmentally beneficial has caused Plaintiff out-of-pocket

1    loss. Defendant knew that the products were not environmentally beneficial but did not disclose such

2    facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable, but mistaken,

3    belief that her P&G Paper Products were sustainable or environmentally neutral or beneficial.

4         33.      Plaintiff intends to purchase sustainably sourced bathroom tissue and facial tissue in

5    the future and continues to see P&G Paper Products available for purchase with substantially similar

6    claims that are at issue in this Complaint. Plaintiff desires to purchase Charmin Toilet Paper and

7    Puffs Tissues again if Plaintiff can be assured that Defendant's sustainability claims were in fact

8    true.

9    **B.**      **Defendant**

10         **1.**        **Procter & Gamble Company**

11         34.      Procter & Gamble Company is an American consumer goods corporation doing

12    business in all 50 states and the District of Columbia. P&G is the largest consumer goods company

13    in the world. It is organized under the laws of the state of Ohio, with its principal place of business

14    in Cincinnati, Ohio. At all times relevant to this action, P&G manufactured and made available for

15    sale Charmin Toilet Paper and Puffs Tissues throughout the United States. As explained more fully

16    herein, P&G misrepresented, concealed, suppressed, and omitted material facts regarding the ancient

17    forest to toilet pipeline.

18                         **IV.**     **FACTUAL ALLEGATIONS**

19    **A.**      **Environmental stewardship is a material attribute to consumers.**

20         35.      A large portion of consumers increasingly care about the environmental impact of

21    products when making purchasing decisions, with many stating that they are willing to pay more for

22    sustainable options and will prioritize brands with environmentally conscious practices. According

23    to the McKinsey study, 78% of U.S. consumers say that a sustainable lifestyle is important to them,

24    and more than 60% of U.S. consumers disclosed that they care about buying environmentally and

25    ethically sustainable products.[17] According to the study's authors, "the research shows that a wide

26

27       [17] *Consumers care about sustainability—and back it up with their wallets*, MᴄKɪɴꜱᴇʏ &

28    Cᴏᴍᴘᴀɴʏ (Feb. 6, 2023), https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/consumers-care-about-sustainability-and-back-it-up-with-their-wallets#/.

range of consumers across incomes, life stages, ages, races, and geographies are buying products bearing ESG-related labels."

36.    It is also well documented that consumers are willing to pay a premium for products from supply chains that are less environmentally damaging. For example, PricewaterhouseCoopers recently published a survey that found that consumers were willing to spend 9.7% more, on average, for sustainably produced or sourced goods, despite inflation and cost-of-living concerns.[18] Similarly, a 2023 study conducted by Bain & Company concluded that consumers are willing to pay at least 12% more for sustainable products.[19]

37.    If one used 10 percent as a value of overpayment in this case based on the misrepresentations and omissions described below, and assumed that P&G sells approximately two billion dollars of Charmin Toilet Paper and one billion dollars of Puffs facial tissue per year, then the minimum overpayment is roughly $300 million per year[20] or $1.2 billion over the four-year class period. But again, this measure is conservative given the materiality of the misrepresentations and omissions described below.

38.    In light of these trends, companies are increasingly allocating time, attention, and resources to position their products and supply chains as environmentally responsible. For example, the McKinsey study reviewed actual consumer purchasing behavior over a five-year period to compare products that made one or more ESG-related claims on their packaging against similar products that made no ESG-related claims. The McKinsey study found that the packages with the ESG-related claims outperformed products that made none, and that there was "a clear and material

---

[18] *Consumers willing to pay 9.7% sustainability premium, even as cost-of-living and inflationary concerns weigh: PwC 2024 Voice of the Consumer Survey*, PRICEWATERHOUSECOOPERS (May 15, 2024), https://www.pwc.com/gx/en/news-room/press-releases/2024/pwc-2024-voice-of-consumer-survey.html.

[19] *See, e.g.*, *Consumers Say Their Environmental Concerns are Increasing Due to Extreme Weather; Study Shows They're Willing to Change Behavior, Pay 12% More for Sustainable Products*, BAIN & COMPANY (Nov. 13, 2023), https://www.bain.com/about/media-center/press-releases/2023/consumers-say-their-environmental-concerns-are-increasing-due-to-extreme-weather-study-shows-theyre-willing-to-change-behavior-pay-12-more-for-sustainable-products/.

[20] Damages estimate is $200 million for Charmin (9.7% multiplied by $2 billion in annual sales) and $100 million for Puffs (9.7% multiplied by $1 billion annual sales) for a total of $300 million of damages per year.

link between ESG-related claims and consumer spending." The McKinsey study's conclusion was especially true in the Household Paper and Plastics (Category 24 below), which boasted significant increases in growth and market share for products with ESG labels.[21]



**Prevalence and performance of environmental, social, and governance-related claims vary by product category.**

Growth differential vs prevalence of ESG¹-related claims by product category

| Food | | Beverage | Household |
|------|------|----------|-----------|
| ● Food | | ● Beverage | ● Household |
| 1 Sweet snacks | 8 Diet and nutrition | 14 Kombucha | 24 Paper and plastics |
| 2 Yogurt | 9 Seafood | 15 Sports drinks | 25 Laundry care |
| 3 Cheese | 10 Baking staples | 16 Packaged coffee | 26 Pet foods |
| 4 Fully cooked meat | 11 Condiments | 17 Fruit drinks | |
| 5 Candy, gum, and mints | 12 Cereal and granola | 18 Soft drinks | ● Personal care |
| 6 Desserts | 13 Salty snacks | 19 Fruit juice | 27 Bath and shower |
| 7 Frozen prepared food | | 20 Ready-to-drink coffee | 28 Cosmetics, nail grooming |
| | | 21 Water | 29 Hair care |
| | | 22 Liquid tea | 30 Baby food |
| | | 23 Beer, cider, FMB³ | 31 Diapers |
| | | | 32 Baby formula |

¹Environmental, social, and governance.
²Difference between June 2018–June 2022 CAGR growth for products with ESG-related claims vs those without.
³Flavored malt beverages.
Source: NielsenIQ

McKinsey & Company

---

[21] *Consumers care about sustainability—and back it up with their wallets*, MᴄKɪɴsᴇʏ & Cᴏᴍᴘᴀɴʏ (Feb. 6, 2023), https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/consumers-care-about-sustainability-and-back-it-up-with-their-wallets#/.

**B.    P&G knows that its environmental stewardship claims are material to consumers.**

39.    P&G also understands the materiality and growth-maximizing value of environmental claims. Accordingly, P&G dedicates considerable resources[22] to position itself as conforming to sustainable forestry practices. For example, the shareholder letter attached to P&G's 2024 Annual Report explains that the Company is "putting additional focus" on "improving the environmental sustainability profile of our brands" in order to "create [a] competitive advantage that can drive shareowner value creation."[23]

40.    Examples of this renewed focus includes highlighting P&G's commitment to sustainability in its Keep Forests as Forests campaign, which include a wide variety of paid social media activity, in-store signage, packaging, digital storytelling, virtual reality experiences, and various NGO partnerships. According to P&G Vice President Tonia Elrod, P&G closely monitors and evaluates its environmental and sustainability messaging to consumers and ultimately concluded that the Keep Forests as Forests campaign succeeded in conveying a "sustainability message." P&G also confirmed that consumers had developed a higher purchase intent from Charmin as a direct result of the environmental claims included in this campaign (in contrast to other attributes such as tissue softness or strength).[24]



---

[22] P&G spent more than $150 million on advertising and marketing Charmin Toilet Paper in 2021 and over $119 million in 2022. *See Procter & Gamble's advertising spending on Charmin in the United States from 2011 to 2022*, STATISTA, https://www.statista.com/statistics/314871/charmin-ad-spend-usa/.

[23] P&G 2024 Annual Report, https://assets.ctfassets.net/oggad6svuzkv/1axqmYoGvExvpVj5ndTYld/dca130713c7612ea84bc4d425752f1cb/2024_annual_report.pdf, at pp. vi–vii.

[24] *Webinar on Promoting Consumer Engagement with Forest Sustainability*, FSC INTERNATIONAL (Nov. 19, 2021), https://www.youtube.com/watch?v=BFB0J3jQlkw, at 27:00.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.    Companies have developed sophisticated greenwashing campaigns to leverage the growth opportunities in environmental claims and messaging.**

41.    "Greenwashing" is the act of misleading consumers regarding the environmental practices of a company or a product. Greenwashing occurs when a company positions itself (or a specific product) as having a positive influence on environmental issues, when, in reality, the company (or product) is either exaggerating its influence and/or actively engaging in negative environmental practices that do not align with it previously touted green goals.

42.    Product-level greenwashing refers to the act of misleading consumers about the environmental benefits of a specific product and can include tactics such as labeling products with false or misleading information regarding their composition.[25] Firm-level greenwashing arises when a company makes false or misleading claims about its overall environmental practices, polices, or performance, rather than just its individual products. According to academic researchers from Pace University's Sustainable Business Law Hub, firm-level greenwashing "involves creating a false image of the company as environmentally responsible, even though its actual practices may be environmental harmful or unsustainable. This form of greenwashing can be particularly damaging as it misleads consumers and investors into thinking that the entire company is environmentally friendly, when in fact only a small portion of its practices may be achieving the stated sustainability goals."

43.    High-profile greenwashing examples include Chevron's 1986 "People Do" campaign, which showed its employees protecting endangered wildlife such as bears, butterflies, and sea turtles—even though the company continued to spill oil in sensitive ecosystems and was being sued at the time for illegally dumping pollutants in Santa Monica Bay. Similarly, Illinois-based concrete producer Ozinga Brothers promised that its proposed Invert mining project on Chicago's Southeast Side neighborhood would eventually result in additional tree plantings, free solar panels, increased recycling opportunities, and a "green" community center. But the company failed to disclose its studies on the expected impact to air quality and transportation. According to

---

[25] Barbara Ballan & Jason J. Czarnezki, *Disclosure, Greenwashing and the Future of ESG Litigation*, 81 WAS. & LEE L. REV. 545, 555-60 (2024).

Case No. _____

one community source, "you'll see tree plantings, recycling, promises for green infrastructure, but then the means to get that supposed green infrastructure [involves] blowing up dynamite to mine for 17 years and bringing thousands of additional diesel trucks into the neighborhood."[26]

**D.    The FTC's "Green Guides" provide critical information to consumers, companies, and courts about deceptive environmental claims.**

44.    Increasingly, what companies think their "green" marketing claims mean and what consumers think they mean may not be the same. As such, the FTC monitors environmentally themed marketing for potentially deceptive claims, and on regular intervals, publishes guidelines to help develop uniform national standards for environmental advertising. Known as the "Guides for the Use of Environmental Marketing Claims"—or more colloquially as the FTC "Green Guides"— this guidance is designed to help marketers avoid making environmental marketing claims that are unfair or deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45.[27] Section 5 of the FTC Act prohibits "unfair or deceptive acts and practices in or affecting commerce[.]" A representation, omission, or practice is deceptive if it is likely to mislead consumers acting reasonably under the circumstances and is material to consumers' decisions.[28]

45.    More specifically, the Green Guides address environmental claims by elucidating (1) general principles that apply to all environmental marketing claims; (2) how consumers are likely to interpret particular claims and how marketers can substantiate these claims; and (3) how marketers can qualify their claims to avoid deceiving consumers.

46.    The Green Guides also play a large role in state consumer protection law. At least twelve states[29] have laws that directly incorporate the standards set forth in the Green Guides as the

---

[26] *What Is Greenwashing?*, NRDC (Feb. 9, 2023), https://www.nrdc.org/stories/what-greenwashing.

[27] FTC, Green Guides, 16 C.F.R. part 260, https://www.ftc.gov/news-events/topics/truth-advertising/green-guides.

[28] *See* FTC Policy Statement on Deception, 103 F.T.C. 174 (1983), https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf.

[29] These states are Alabama, California, Florida, Indiana, Maine, Maryland, Michigan, Minnesota, New Mexico, New York, Pennsylvania, Rhode Island, and Washington.

CLASS ACTION COMPLAINT – 17                                    Case No. _____
011290-11/3201168 V1

1  legal standard for lawfully making certain marketing claims.[30] Additionally, twenty-seven states and

2  territories[31] have laws providing that the FTC's interpretation in the Green Guides shall serve as

3  persuasive authority for courts construing a particular state consumer protection law. The Green

4  Guides have also been used as evidence in court proceedings involving false advertising litigation.[32]

5         47.    According to the FTC, "marketers must ensure that all reasonable interpretations of

6  their claims are truthful, not misleading, and supported by a reasonable basis before they make the

7  claims" and that "a firm's failure to possess and rely upon a reasonable basis for objective claims

8  constitutes an unfair and deceptive act or practice in violation of Section 5 of the Federal Trade

9  Commission Act."

10        48.    The FTC Green Guides also expressly describe a marketer's responsibilities when

11  making environmental claims. Some of these include:

> **§ 260.2 Interpretation and substantiation of environmental marketing claims.** A representation, omission, or practice is deceptive if it is likely to mislead consumers acting reasonably under the circumstances and is material to consumers' decisions. To determine if an advertisement is deceptive, marketers must identify all express and implied claims that the advertisement reasonably conveys. Marketers must ensure that all reasonable interpretations of their claims are truthful, not misleading, and supported by a reasonable basis before they make the claims. In the context of environmental marketing claims, a reasonable basis often requires competent and reliable scientific evidence [created] in an objective manner by qualified persons. (emphasis added) (citation omitted)
>
> **§ 260.3 (a) Qualifications & disclosures.** To prevent deceptive claims, qualifications and disclosures should be clear, prominent, and understandable.
>
> **§ 260.3 (c) Overstatement of environmental attribute.** An environmental marketing claim should not overstate, directly or by

---

[30] Comments to the FTC regarding Green Guides Review from the attorneys general of California, Connecticut, Delaware, Illinois, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Wisconsin (Apr. 24, 2023), https://oag.ca.gov/system/files/attachments/press-docs/Comments%20to%20FTC%20re%20Green%20Guides%204.24.23.pdf.

[31] These are Alabama, Alaska, Arizona, Connecticut, District of Columbia, District of Guam, Florida, Idaho, Georgia, Illinois, Maine, Maryland, Massachusetts, Michigan, Montana, New Hampshire, New Mexico, Ohio, South Carolina, Rhode Island, Texas Tennessee, Utah, Vermont, Washington, and West Virginia.

[32] Barbara Ballan & Jason J. Czarnezki, *Disclosure, Greenwashing and the Future of ESG Litigation*, 81 WAS. & LEE L. REV. 545, 565 (2024).

implication, an environmental attribute or benefit. Marketers should not state or imply environmental benefits if the benefits are negligible.

*Example 1*: An area rug is labeled "50% more recycled content than before" [but] the manufacturer increased the recycled content of its rug from 2% recycled fiber to 3%. Although the claim is technically true, it likely conveys the false impression that the manufacturer has increased significantly the use of recycled fiber.

. . .

**§ 260.4 General environmental benefit claims.** (a) It is deceptive to misrepresent, directly or by implication, that a product, package or service offers a general environmental benefit. (b) Unqualified general environmental benefit claims are difficult to interpret and likely convey a wide range of meanings. In many cases, such claims likely convey that the product, package, or service has specific and far-reaching environmental benefits that may convey that the item or service has no negative environmental impact. Because it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims, markets should not make unqualified general environmental benefit claims.

*Example 3:* A marketer's advertisement features a laser printer in a bird's nest balancing on a tree branch, surrounded by dense forest. In green type, the marketer states, "Buy our printer. Make a change." Although the advertisement does not expressly claim that the product has environmental benefits, the featured images, in combination with the text, likely convey that the product has far reaching environmental benefits and may convey that the product has no negative environmental impact. Because it is highly unlikely that a marketer can substantiate these claims, this advertisement is deceptive.

. . .

**§ 260.6 Certifications and seals of approval**: (a) It is deceptive to misrepresent, directly or by implication, that a product, package has been endorsed or certified by an independent third party. (b) A marketers use of the name, logo, or seal of approval of a third party certifier or organization may be an endorsement, which should meet the criteria of the FTC's Endorsement Guides . . . (c) Third-party certification does not eliminate a marketers' obligation to ensure that it has substantiation for all claims reasonably communicated by the certification. (d) A marketer's use of an environmental certification or seal of approval likely conveys that the product offers a general environmental benefit .Because it is highly unlikely that marketers can substantiate general environmental benefit claims, marketers should not use environmental certifications or seals that do not convey the basis for the certification. (e) . . . To avoid deception, marketers should use clear and prominent qualifying language that clearly conveys that the certification or seal refers only specific and limited benefits.

*Example 2:* A manufacturer advertises its product as "certified by the American Institute of Degradable Materials." Because the advertisement does not mention that the American Institute of Degradable Materials ("AIDM") is an industry trade association, the certification likely conveys that it was awarded by an independent certifier. To be certified, marketers must meet standards that have been developed and maintained by a voluntary consensus standard body. […] A voluntary consensus standards body is defined by the following attributes: (i) Openness, (ii) balance of interest, (iii) due process, (iv) an appeals process, (v) consensus, which is defined as general agreement, but not necessarily unanimity, and includes a process for attempting to resolve objections by interested parties, as long as all comments have been fairly considered, each objector is advised of the disposition of his or her objection(s) and the reasons why, and the consensus members are given an opportunity to change their votes after reviewing the comments.

*Example 4*: A marketer's package features a seal of approval with the text "Certified Non-Toxic." The seal is awarded by a certifier with appropriate expertise in evaluating ingredient safety and potential toxicity. It applies standards developed by a voluntary consensus standard body. Although non-industry members comprise a majority of the certifier's board, an industry veto could override any proposed changes to the standards. This certification likely conveys that the product is certified by an independent organization. This claim would be deceptive because industry members can veto any proposed changes to the standards.

*Example 6:* product label contains an environmental seal, either in the form of a globe icon or a globe icon with the text "EarthSmart." EarthSmart is an independent, third-party certifier with appropriate expertise in evaluating chemical emissions of products. While the marketer meets EarthSmart's standards for reduced chemical emissions during product usage, the product has no other specific environmental benefits. Either seal likely conveys that the product has far-reaching environmental benefits, and that EarthSmart certified the product for all of these benefits. If the marketer cannot substantiate these claims, the use of the seal would be deceptive. The seal would not be deceptive if the marketer accompanied it with clear and prominent language clearly conveying that the certification refers only to specific and limited benefits. For example, the marketer could state next to the globe icon: "EarthSmart certifies that this product meets EarthSmart standards for reduced chemical emissions during product usage." Alternatively, the claim would not be deceptive if the EarthSmart environmental seal itself stated: "EarthSmart Certified for reduced chemical emissions during product usage."

*Example 7*: A one-quart bottle of window cleaner features a seal with the text "Environment Approved," granted by an independent, third-party certifier with appropriate expertise. The certifier granted the seal after evaluating 35 environmental attributes. This seal likely conveys that the product has far-reaching environmental benefits and that Environment Approved certified the product for all of these benefits and therefore is likely deceptive. The seal would likely not

1   be deceptive if the marketer accompanied it with clear and
2   prominent language clearly conveying that the seal refers only to
    specific and limited benefits.

3   For example, the seal could state: "Virtually all products impact the
4   environment. For details on which attributes we evaluated, go to [a
    Web site that discusses this product]." The referenced Web page
5   provides a detailed summary of the examined environmental
    attributes. A reference to a Web site is appropriate because the
6   additional information provided on the Web site is not necessary to
    prevent the advertisement from being misleading. As always, the
7   marketer also should ensure that the advertisement does not imply
    other deceptive claims, and that the certifier's criteria are sufficiently
    rigorous to substantiate all material claims reasonably
8   communicated by the certification.

9       49.     The Green Guides also provide guidance regarding the use of terms such as

10  "sustainability" as this term likely implies certain environmental benefits. Although the Green

11  Guides do not define sustainability per se, "this does not mean unscrupulous marketers are free to

12  deceive consumers."[33] Indeed, according to the FTC, "marketers still are responsible for

13  substantiating consumers' reasonable understanding of these claims." For example, "if in context

14  reasonable consumers perceive a sustainable claim as a general environmental benefit claim, the

15  marketer must be able to substantiate that claim and all attendant reasonably implied claims" and

16  that, typically, a generic sustainability claim "presents substantiation challenges." For that reason,

17  the FTC has admonished companies not to use unqualified claims such as "sustainable" due to its

18  determination that "it is highly unlikely that they can substantiate reasonable interpretations of these

19  claims."[34]

20  **E.      P&G sells more than $3 billion worth of P&G Paper Products each year.**

21      50.     P&G is one of the biggest consumer goods companies in the world. In 2016, the

22  company generated net sales worth about $65.3 billion U.S. dollars. And according to P&G's 2024

23  Annual Report, Charmin Toilet Paper represents approximately 25% of the North American market

24  for toilet paper. Charmin Toilet Paper is also routinely found in the top 10 sales of the leading toilet

25  ───────────────

26  [33] *The Green Guides Statement of Basis and Purpose*, FTC,
    https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-
    guides/greenguidesstatement.pdf, at 258.

27  [34] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, FTC (Apr. 2,
    2019),      https://www.ftc.gov/news-events/news/press-releases/2019/04/ftc-sends-warning-letters-
28  companies-regarding-diamond-ad-disclosures.

paper brands in the United States, with typical sales of over $2 billion a year.[35] Indeed, according to U.S. Census data and the Simmons National Consumer Survey, 86.27 million Americans used Charmin Ultra in 2020 alone.

51.      Similarly, Puffs Tissue Paper is routinely found in the top three brands for disposable tissues and retains approximately 15-20% of the $5 billion tissue paper market.

**F.      P&G touts its environmental stewardship via its Keep Forests as Forests campaign.**

52.      P&G created the Keep Forests as Forests campaign to convey an overall impression to consumers that P&G is not only committed to, but also working meaningfully toward, environmental sustainability. The Keep Forests as Forest campaign also conveys an overall impression to consumers that P&G is taking measurable steps towards actively mitigating and/or neutralizing the environmental harm associated with harvesting the pulp for P&G Paper Products within the forests in which P&G harvests.

**1.      P&G displays its Protect-Grow-Restore messaging and third-party certifications at point of sale.**

53.      P&G employs a multitude of layered and integrated marketing practices, such as paid social media activity, in-store signage, packaging, digital storytelling, virtual reality experiences, and various NGO partnerships, to consistently position P&G Paper Products as an environmentally sustainable choice for consumers. Layered and integrated marketing are strategies that use multiple channels to promote a brand or convey an overall impression or message. These channels, or "vehicles," can include packaging, social media, ads, content, and digital or live events. Layered and integrated marketing practices are especially effective in establishing credibility and conveying a consistent and unified message to consumers over time.

54.      For example, Vice President of Family Care Communications and P&G Responsible Sourcing, Tonia Elrod, explains that P&G relies on the "Charmin Brand Ambition" to consistently disseminate its environmental sustainability claims under the umbrella of Keep Forests as Forests.[36]

---

[35] *Sales of the leading 10 toilet tissue brands of the United States in 2017*, STATISTA, https://www.statista.com/statistics/188710/top-toilet-tissue-brands-in-the-united-states/.
[36] *Webinar on Promoting Consumer Engagement with Forest Sustainability*, FSC INTERNATIONAL (Nov. 19, 2021), https://www.youtube.com/watch?v=BFB0J3jQlkw.

55.    A key part of the Keep Forests as Forests campaign is the three promises P&G makes to consumers via the Protect-Grow-Restore logo. For its "Protect" promise, P&G conveys to reasonable consumers the overall impression that P&G Paper Products are environmentally sustainable in part because it is made exclusively from pulp certified by the Forest Stewardship Council. The Forest Stewardship Council ("FSC") is an international non-profit that promotes responsible management by offering a forest certification system for forests and forest products. For its "Grow" promise, P&G promises that for every tree used by P&G, at least two are regrown in its place.[37] This conveys to reasonable consumers the overall impression that the company is mitigating the environmental harm caused by its harvesting of wood pulp by helping to replace the original biodiversity and ecological value of the forest harvested via thoughtful and effective replanting efforts. For its "Restore" promise, P&G touts its partnership with the Arbor Day Foundation to plant one million trees in forests affected by natural disasters. This promise conveys to reasonable consumers the overall impression that P&G supply chain is not only regrowing its own harvested areas but *also* contributing to restoring additional areas outside of its sourcing activities. This, in turn, implies to consumers that the purchase of a P&G Paper Product is either environmentally neutral or a net environmental benefit.

---

[37]    *Friend of the Forest Award 2018 | Charmin & Arbor Day Foundation*, CHARMIN, https://youtu.be/DPMpB_ZmC4U, at 1:01.

56.    The Keep Forests as Forests campaign and Protect-Grow-Restore messaging have been persistently and consistently used by P&G in relation to P&G Paper Products to tout environmental responsibility at point-of-sale. Below are some examples.

**2.    Charmin Toilet Paper packaging includes the unqualified FSC logo in a prominent location at the front of the package.**

57.    Companies who work with the FSC are entitled to display various FSC logos to reflect the company's commitment to various levels of responsible forest management. The unqualified FSC logo looks like this:



58.    The pictures below are from the front packaging for Charmin Ultra Strong toilet paper (upper left), Charmin Ultra Soft Mega size (upper right), Charmin Ultra Soft toilet paper standard size (bottom left), and Charmin Ultra Gentle (bottom right). The unqualified FSC logo is prominently and unambiguously included on the front of each Charmin brand at point-of-sale:






59.     The unqualified FSC logo on the front of Charmin Toilet Paper packaging would be interpreted by a reasonable consumer as unambiguously representing that Charmin Toilet Paper is made from pulp exclusively derived from FSC-certified forests; and in turn, Charmin Toilet Paper is a more sustainable choice when compared to other brands that do not have the unqualified FSC logo. Moreover, there are no qualifications, disclaimers, or asterisks on the front of the package that would create any ambiguity as to the source of the wood pulp in Charmin Toilet Paper that would cause a reasonable consumer to necessarily review the back of the package for more information. But as explained more fully below, P&G's use of this logo and its associated meaning is deceptive as only a small fraction of Charmin Toilet Paper pulp is derived from FSC-certified forests.

### 3.     Charmin Toilet Paper packaging also includes the Protect-Grow-Restore and "Rainforest Alliance" logos.

60.     The below pictures are from the back packaging for Charmin Ultra Strong toilet paper (upper left), Charmin Ultra Soft Mega size (upper right), Charmin Ultra Soft toilet paper standard size (bottom left), and Charmin Ultra Gentle (bottom right). The Protect-Grow-Restore logo and Rainforest Alliance logos are included on each Charmin variation at point-of-sale and are practically identical.






**4.    Puffs Tissues packaging also displays the same FSC and Rainforest Alliance certifications as well as P&G's Protect-Grow-Restore logo.**

61.    The below pictures show boxes of Puffs Plus Lotion and Puffs Ultra Soft tissues. The unqualified FSC logo is prominently displayed on the front of each of the packages. The Rainforest Alliance logo and the Protect-Grow-Restore logo are also uniformly displayed on each Puffs Tissues package. These messages and certifications on the Puffs Tissues packaging imply the same overall impression as the messages and certifications on the Charmin Toilet Paper packaging.

 

 

**5.    P&G extends the exposure and reach of its Keep Forests as Forests campaign at digital point-of-sale locations with national retailers.**

62.    P&G also relies on a robust network of retailers to make P&G Paper Products available for sale in all 50 states and territories via their online selling platforms. In so doing, P&G

1    drastically increases the reach of its Protect-Grow-Restore and other Keep Forests as Forests

2    messaging. According to the websites of these retailers, manufacturers like P&G are responsible for

3    supplying the images, layout, "product detail", and "thumbnail" information to market the product

4    on the retailer's webpage. Below are examples from some of the nation's leading retailers

5    consistently displaying these Protect-Grow-Restore and Keep Forests as Forests messages, which

6    helps position P&G Paper Products to be perceived as an environmentally steward.

7              a.        **Kroger Point-of-Sale Listing for Charmin Ultra Strong Toilet Paper[38]**

8         63.     This Kroger listing depicts a listing for Charmin Ultra Strong Toilet Paper for sale on

9    Kroger's website. As seen below, P&G continues to prominently show the unqualified FSC logo on

10   the front of the package. And in the Product Details section P&G reiterates its Protect-Grow-Restore

11   message while also stating that "all our pulp used is 100% FSC-certified" and "we plant two trees

12   for every one used." According to P&G "that's how we're helping keep forests, forests."

13   **Product Details**

14

15      Get sparkly clean with Charmin Ultra Strong. Its 4X stronger when wet and

16                          has a diamond-weave texture. Its woven like a washcloth and holds up
                            when you wipe. It even cleans better so you can use less and go longer

17                          without changing the roll. We also made it MEGA in size, so you get mega
                            value. Thats right, our Charmin Ultra Strong Mega Roll is way bigger,

18                          equals 4 regular rolls, and its more bang for your behind so youll be
                            running back to the store less and less (based on number of sheets in

19                          Charmin Regular Roll bath tissue). Our Charmin Ultra Strong toilet paper is
                            also 2-ply and designed to be clog-safe and septic-safe so you can flush

20                          confidentially and keep clean. And at Charmin, we love trees so we work
                            hard to protect, grow and restore forests. Its why all our pulp used is 100%

21                          FSC certified. Its why we plant two trees for every one used. And its why
                            we help to restore forests devastated by natural disaster through the

22                          Arbor Day Foundation. Thats how were helping keep forests, forests. We
                            all go, why not Enjoy The Go with Americas favorite toilet paper.

23

24

25

26

27

28   _____
     [38]    Kroger,    https://www.kroger.com/p/charmin-ultra-strong-toilet-paper-231-sheets-roll-32-rolls-/0003077208632 (last accessed Jan. 15, 2025).

Case No. _____
011290-11/3201168 V1

b. **Walmart Point-of-Sale Listing for Charmin Ultra Strong Toilet Paper**[39]

64.     This Walmart listing depicts a listing for Charmin Ultra Strong Toilet Paper for sale on Walmart's website. It is almost identical to the Kroger listing above. Again, P&G continues to prominently show the unqualified FSC logo on the front of the package. And in the Product Details section, P&G reiterates its Protect-Grow-Restore message while also stating that "all our pulp used is 100% FSC-certified" and "we plant two trees for every one used." The claim that P&G is "helping keep forests, forests" is also reiterated.



Product details

Get sparkly clean with Charmin Ultra Strong. It's 4X stronger when wet* and has a diamond-weave texture. It's woven like a washcloth and holds up when you wipe. It even cleans better so you can use less* and go longer without changing the roll**.

We also made it MEGA in size, so you get mega value. That's right, our Charmin Ultra Strong Mega Roll is way bigger, equals 4 regular rolls, and it's more bang for your behind so you'll be running back to the store less and less (based on number of sheets in Charmin Regular Roll bath tissue). Our Charmin Ultra Strong toilet paper is also 2-ply and designed to be clog-safe and septic-safe so you can flush confidentially and keep clean.

And at Charmin, we love trees so we work hard to protect, grow and restore forests. It's why our pulp used is 100% FSC certified. It's why we plant two trees for every one used. And it's why we help to restore forests devastated by natural disaster through the Arbor Day Foundation. That's how we're helping keep forests, forests. We all go, why not Enjoy The Go with America's favorite toilet paper***.

c. **Costco Point-of-Sale Listing for Charmin Ultra Soft Toilet Paper**[40]

65.     This Costco listing depicts a listing for Charmin Ultra Soft Toilet Paper for sale on Costco's website. As seen below, Charmin continues to prominently show the unqualified FSC logo on the front of the package. The back of the package also includes the Protect-Grow-Restore logo, which also directs consumers to Charmin's Sustainability Promise website. And as with the Kroger listing, this Costco listing makes the same Protect-Grow-Restore promises in the Product Details section of the listing. The visual thumbnails displayed next to a picture of Charmin Toilet Paper profiles the unqualified FSC logo, the Protect-Grow-Restore logo and a statement that "100% of our paper comes from responsibly managed forests."

---

[39] Walmart, https://www.walmart.com/ip/Charmin-Ultra-Strong-Toilet-Paper-231-Sheets-Roll-32-Rolls/6137370255?wmlspartner=wlpa&selectedSellerId=102537451&sid=4818cbef-50ce-4890-a9f2-f1917941ff93 (last accessed Jan. 15, 2025).
[40] Costco, https://www.costco.com/charmin-ultra-soft-bath-tissue%2C-2-ply%2C-213-sheets%2C-30-rolls.product.4000221238.html (last accessed Jan. 15, 2025).





## Charmin Beyond The Roll







**FSC™ Certified**

We only use pulp certified by the Forest Stewardship Council® and support FSC® in their work to increase adoption of FSC products. These standards ensure that we are protecting wildlife and contributing to thriving local communities.

**Protect, Grow and Restore**

At Charmin, we are committed to making our toilet paper work hard to make a sustainable difference. 100% of our paper comes from responsibly managed forests.

**Forest Restoration**

P&G and Charmin are partnering with the Arbor Day Foundation to plant 1 million trees in forests affected by natural disasters, like wildfires or hurricanes.

d.    **Lowe's Point-of-Sale Listing for Charmin Ultra Soft Toilet Paper[41]**

66.    This Lowe's website listing for Charmin Ultra Soft Toilet Paper contains the same unqualified FSC logo prominently displayed on the front of the package and includes the same Protect-Grow-Restore promises in the Product Features section of the listing. The thumbnails displayed next to the photograph of the product have the same FSC-certified claims and states that "100% of our paper comes from responsibly managed forests." In addition, this Lowe's listing also highlights P&G's promise to "regrow two trees for every one used."




**Charmin Beyond The Roll**





**FSC™ Certified**

We only use pulp certified by the Forest Stewardship Council® and support FSC® in their work to increase adoption of FSC products. These standards ensure that we are protecting wildlife and contributing to thriving local communities.

**Protect, Grow and Restore**

At Charmin, we are committed to making our toilet paper work hard to make a sustainable difference. 100% of our paper comes from responsibly managed forests.

**Forest Restoration**

P&G and Charmin are partnering with the Arbor Day Foundation to plant 1 million trees in forests affected by natural disasters, like wildfires or hurricanes.

---

[41]    https://www.lowes.com/pd/Charmin-Ultra-Soft-Super-Mega-12-Pack-2-ply-Toilet-Paper/5014633869 (last accessed Jan. 15, 2025).

1

2

e.    **Amazon's Point-of-Sale Listing for Charmin Ultra Gentle Toilet Paper[42]**

67.    This Amazon website listing for Charmin Ultra Gentle Toilet Paper contains the same

unqualified FSC logo prominently displayed on the front of the package and the same FSC-certified

thumbnails, and includes the same Protect-Grow-Restore promises in the Product Features section

of the listing.



**Charmin Beyond The Roll**





**FSC™ Certified**

We only use pulp certified by the Forest Stewardship Council® and support FSC® in their work to increase adoption of FSC products. These standards ensure that we are protecting wildlife and contributing to thriving local communities.

**Protect, Grow and Restore**

At Charmin, we are committed to making our toilet paper work hard to make a sustainable difference. 100% of our paper comes from responsibly managed forests.

**Forest Restoration**

P&G and Charmin are partnering with the Arbor Day Foundation to plant 1 million trees in forests affected by natural disasters, like wildfires or hurricanes.

---

[42] Amazon, https://a.co/d/2ldcVhu (last accessed Jan 15 2025).

CLASS ACTION COMPLAINT – 31                                    Case No. _____
011290-11/3201168 V1

f. **Puffs Tissues digital point-of-sale listings also contain the same logos and environmental representations.**

68.    P&G also makes available for sale Puffs Tissues products using the same robust network of storefront and digital retailers it uses for Charmin products. P&G also supplies information for P&G Paper Products to these retailers, with the expectation that this information be included on the digital point-of-sale website. As with Charmin, the Puffs' point-of-sale listings for digital retailers also contain the same uniform misrepresentations and omissions that help position Puffs Tissues to be perceived by consumers as an environmentally responsible product.

69.    For example, this Amazon listing[43] for Puffs Ultra Soft facial tissues for sale on Amazon's website contains the same unqualified FSC logo prominently displayed on the front of the package. It also contains a Puffs Sustainability Promise:







---

[43] Amazon, https://a.co/d/7gRK2fP (last accessed May 23, 2025).

70.    Similarly, below is Target's digital point-of-sale listing[44] for Puffs Plus Lotion. This listing also prominently shows the unqualified FSC logo on the front of the Puffs package. And under information supplied in the "By the Brand" section include thumbnails that articulate Puffs Sustainability Promise:









---

[44]    Target, https://www.target.com/p/puffs-plus-lotion-facial-tissue/-/A-84780543?preselect= 94370770#lnk=sametab (last accessed May 23, 2025).

**6.  P&G also directs consumers to its Sustainability Promise websites via its P&G Paper Products packaging.**

71.    P&G directs Charmin consumers to visit its "Charmin Sustainability Promise website"[45] which prominently features three videos with the Protect-Grow-Restore message:









---

1
2

    **a.**    **The "Protect" video depicts FSC-certified forests in the United States that are owned by small landowners who follow FSC responsible forest management guidance.**

3
4
5
6
7
8
9
10

 

11
12
13
14
15
16

72.    The caption next to the "Protect Video" states that P&G only uses pulp certified by the FSC. The video also features P&G employee and Papermaking Materials Leader Lois Forde-Kohler, who states: "When you see an FSC logo on a Charmin package, you know that we are working with suppliers to bring their products to us in a sustainable, responsible way. They have foresters who have the best forest management plans, including replanting, in order to continue to 'Keep Forests as Forests.'" As explained below, this claim is objectively false.

17
18

    **b.**    **The "Grow" video prominently displays the unqualified FSC and "Rainforest Alliance Certified" logos and promises to replant at least 1-2 new trees for every tree used in its products.**

19
20
21
22
23

  

24
25
26

73.    The "Grow Video" on the Charmin Sustainability Promise website also depicts the FSC-certified label on the front of a Charmin package while stating that Charmin wood pulp is

27
28

sourced from "responsibly managed forests, which means for every tree [Charmin] uses in its products a new one is planted in its place."[46] As explained below, this claim is misleading.

       c.     **The "Restore" video promises that P&G will help plant 1 million trees between 2020 and 2025 in areas devastated by natural disasters.**



74.    The "Restore Video" also states: "replanting efforts must involve thinking into the future 20 years, 50 years, 100 years out so you are planting it for the next generation."

       d.     **P&G also maintains an additional Sustainability Promise website for its Puffs Tissues products where it makes the same Protect-Grow-Restore environmental claims.**

75.    Like Charmin, P&G maintains a website for its Puffs products entitled "Puffs Sustainability Promise" which promises consumers that "we are committed to helping keep forests as forests" and reiterates the same Protect-Grow-Restore representations as is does with Charmin.[47] This webpage is depicted below:

---

[46] *Friend of the Forest Award 2018 | Charmin & Arbor Day Foundation*, Charmin, https://youtu.be/DPMpB_ZmC4U, at 1:01.

[47] *Puffs Sustainability Promise*, https://puffs.com/en-us/experience-main-section/sustainability (last accessed May 23, 2025).

Case No. _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



7.    **P&G also produced a viral Protect-Grow-Restore YouTube video repeating its key promises to consumers.**



At Charmin®, we make paper and we love trees.

76.    In 2022, Charmin also created a Protect-Grow-Restore YouTube video that, as of January 14, 2025, has been viewed over 58.3 million times.[48] While exclaiming that "we LOVE trees" P&G also reiterates the following claims to consumers: "we protect forests by using pulp certified by the Forest Stewardship Council"; "we regrow at least two trees for every tree we use"; and "Charmin helps restore trees through the Arbor Day Foundation, so you can enjoy the go, but forests remain forests." As explained below, these claims are misleading.

**G.    P&G also touts its environmental messaging and enforcement promises to investors.**

77.    P&G also touts its environmental messaging in its investor relations materials. For example, in its 2023 Citizenship Report, P&G states: "We are committed to responsible sourcing of key commodities like wood pulp, palm oil and paper packaging together with respecting human, labor and land tenure rights in our supply chains. We are also going beyond responsible sourcing to help restore and protect landscapes near our existing supply chains and invest in natural climate

---

[48] Charmin, https://www.youtube.com/watch?v=9WARhjajugQ (last accessed Jan. 14, 2025).

solutions that can remove and store more carbon."[49] Similarly, on the "Mapping Our Impact" and "Environment – Pulp" webpages on P&G's investor relations website, P&G states that "[w]e are committed to no deforestation in our wood pulp, paper packaging, and palm supply chains and are delivering on our responsible sourcing goals."[50] And in P&G's 2022 Forestry Update, P&G stated that it was going to "hold[] our Suppliers to Higher Standards" by emphasizing that its "Wood Pulp Sourcing Policy does not allow deforestation or forest conversion."[51]

**H.    P&G's Keep Forests as Forests campaign and Protect-Grow-Restore promises are misleading because of the following misrepresentations and material omissions.**

78.    As explained more fully below, P&G statements about its environmental sustainability efforts mislead reasonable consumers because P&G does not disclose that: (1) P&G Paper Products are fundamentally unsustainable products due to their heavy reliance on virgin forest fiber derived from the clearcutting and burning of Canada's boreal forest; (2) P&G's actual supply chain practices directly contradict the sustainability goals presented on P&G Paper Products packaging and Sustainability Promise websites; and (3) P&G's sustainability promises do not substantially mitigate and/or neutralize the environmental harm caused by P&G's supply chain and single-use Paper Products.

**1.    P&G's "Protect" promise misleads consumers because P&G does not disclose that P&G Paper Products are sourced from harvests that rely on devastatingly harmful industrial logging practices.**

**a.    P&G sources most of its wood pulp Canada's boreal forest, an ecological jewel and one of the last primary forests on earth.**

79.    Primary forests are intact ecosystems, filled with centuries-old conifers and birches that have not been altered by human activity. Because of these unique characteristics, Canada's boreal forest provides refuge to a wide variety of wildlife, including keystone species such as salmon, black bears, caribou, and snowshoe hares.[52] The boreal is also critical to North America's

---

[49]    P&G Environmental-Nature webpage, https://www.pginvestor.com/esg/environmental/forestry/default.aspx (last accessed Jan. 15, 2025).
[50]    *Id.*
[51]    *Procter & Gamble: Protecting Forests for Generations to Come* (Sept. 23, 2022), https://us.pg.com/blogs/pg-responsible-sourcing-2022/.
[52]    *You've Heard Charmin's Spin, Now Here Are the Facts*, NRDC (Aug. 2020) https://www.nrdc.org/sites/default/files/pg-charmin-boreal-truths-fs.pdf.

bird population, serving as the nesting grounds for more than three billion birds, from songbirds to whooping cranes to the great gray owl.[53] The boreal forest is also home to an extensive range of mammals, insects, fungi, and microorganisms.



80.    Primary forests are also responsible for storing around 30-40% of the earth's land-based carbon. Because of their cold climate and slow decomposition rates, boreal forests accumulate large amounts of carbon in their soil and peat, making them one of the largest terrestrial carbon sinks on Earth.[54] Indeed, the boreal forest can store twice as much carbon per acre as the Amazon rainforest. And the boreal forest in Canada is no exception. Thus, changes in the quality and biodiversity of Canada's boreal have significant impacts worldwide.

---

[53] Dana Kobilinsky, *Forest Degradation in Canada Causes Bird Decline*, THE WILDLIFE SOCIETY (May 3, 2022), https://wildlife.org/forest-degradation-in-canada-causes-bird-decline/.

[54] Ronnie Drever, *Primer on Forest Carbon*, NATURE UNITED, https://www.natureunited.ca/what-we-do/our-priorities/innovating-for-climate-change/forest-carbon-boreal-forest/; Beverly Law & William Moomaw, *Old forests are critically important for slowing climate change and merit immediate protection from logging*, THE CONVERSATION (Jan. 19, 2024), https://theconversation.com/old-forests-are-critically-important-for-slowing-climate-change-and-merit-immediate-protection-from-logging-220771; Ian Austen and Vjosa Isai, *Canada's Logging Industry Devours Forests Crucial to Fighting Climate Change*, THE NEW YORK TIMES (Jan. 4, 2024), https://www.nytimes.com/2024/01/04/world/canada-canada-boreal-forest-logging.html.

 

81.    Governmental and environmental researchers can measure and closely monitor the impact of industrial logging operations on the overall health of the boreal forest. For example, caribou habitat is used by environmental researchers as a reliable proxy for the overall health of the boreal forest, due to the caribou's dependence on mature, undisturbed forests and their sensitivity to environmental changes within this unique ecosystem. And studies show significantly reduced boreal caribou ranges within the forests being logged[55] to supply the mills in P&G's supply chain.[56]

**b.    Deforestation Practices and Forest Degradation Practices both incorporate the same industrial logging activities that devastate the health of Canada's boreal forest.**

82.    The terms "Deforestation" and "Forest Degradation" are often used interchangeably by consumers but are technically distinct terms. Understanding the difference is important because conflating them can be misleading when accurately assessing the health of forest ecosystems or the overall impact of certain logging activities.

83.    Deforestation is a highly technical term that refers to the complete clearing of a forest in order to permanently put something else in its place—like agricultural farming, urban

---

[55] Courtenay Lewis & Ashley Jordan, *By a Thousand Cuts: How Powerful Companies' Wood Sourcing is Degrading Canada's Boreal Forest*, NRDC (Apr. 2021), https://www.nrdc.org/sites/default/files/thousand-cuts-wood-sourcing-canadas-boreal-report.pdf.

[56] P&G's suppliers include Aditya Birla's AV Terrace Bay mill, Domtar's Dryden mill, and Resolute Forest Products' Thunder Bay mill. Based on the most recent available Forest Management Unit (FMU) annual reports, these mills receive pulp from the following areas: Black Spruce Forest, English River Forest, Lac Seul Forest, Lake Nipigon Forest, Kenogami Forest, Red Lake Forest, Trout Lake Forest, and Whiskey Jack Forest. According to each of the Ontario Integrated Range Assessment Reports, these FMUs overlap with the Berens, Brightsand, Nipigon, and Sydney boreal caribou ranges, each of which is are declining according to Ontario government reports. *See You've Heard Charmin's Spin, Now Here Are the Facts*, NRDC (Aug. 2020), https://www.nrdc.org/sites/default/files/pg-charmin-boreal-truths-fs.pdf (note 4).

development or mining operations.[57] Deforestation often also requires an official and permanent change in the land use classification by a governmental entity. Currently, most "Deforestation" occurs in the tropics (and therefore not part of P&G Paper Products supply chain) and the cleared land is replaced with cattle ranges or industrial crops such as soy and palm oil.

84.    In contrast, "Forest Degradation" involves slightly less tree removal than deforestation, but still results in substantial declines in forest quality or ecosystem value. And because suppliers do not remove the entire forest, they do not have to petition the government to permanently change the land use classification for the area. As such, Forest Degradation is prevalent in Canada's boreal forest and according to researchers is a dominant practice in the lands harvested for the wood pulp that P&G relies on to make its Paper Products.[58]

85.    Unfortunately, Forest Degradation practices can be equally devastating to the ecosystem of a forest as Deforestation practices. For example, under a Forest Degradation practice, loggers are allowed to bulldoze roads into forests, extract as many high-value trees as possible, and drag the wood back out of the forest to sell. As such, forest degraded via unsustainable logging will have substantially similar characteristics as deforested forest, including: the existence of bare clearings, a spiderweb of roads, ravaged vegetation and undergrowth, and trenches carved into the forest floor. Below is a comparison between lands subject to Deforestation versus Forest Degradation.[59]

---

[57]    According to the United Nations' Food and Agricultural Organization, the term "deforestation" means "conversion of forest to other land use independently of whether human-induced or not." *The State of the World's Forests 2022*, Food and Agriculture Organization of the United Nations, https://openknowledge.fao.org/server/api/core/bitstreams/8f599970-661d-45f5-a598-2ea46ca1605f/content/src/html/deforestation-land-degradation.html.

[58]    *The State of the Forest in Canada: Seeing through the Spin* (January 2024), https://static1.squarespace.com/static/65979bff5ba3be76d68786da/t/65a798ffa51dad62eedc3657/1705482499707/State-of-the-Forest-in-Canada-Jan-2024.pdf.

[59]    *Id.*

CLASS ACTION COMPLAINT – 42
011290-11/3201168 V1

Case No. _____

1
2
3
4
5
6
7
8



9    86.    Although equally devastating to the long-term health of primary forests, Forest

10  Degradation unfortunately often goes underreported, especially in satellite data, and its long-term

11  impacts on biodiversity, carbon storage, and ecosystem health can be just as severe. And therefore,

12  policies that ignore degradation also overlook a major part of forest decline or give a false impression

13  of progress. Forest Degradation is also a stepping-stone to deforestation. Once one logging company

14  starts making roads deep into a forest, others follow behind.

15         **c.**    **P&G promises "no deforestation" while also misleading consumers as to the extent of the harm caused by the Forest Degradation Practices in the P&G Paper Products supply chain.**

16
17  87.    P&G consistently states that it is committed to no deforestation in its supply chain.

18  For example, P&G publicly discloses its "Forest Commodities Policy" that it is "committed to no

19  deforestation and no exploitation in our forest supply chains."[60] But, by relying on an extremely

20  narrow technical definition of Deforestation P&G can skirt accountability for industrial practices

21  such as clearcutting and burning, like those pictured below, as long as the area does not permanently

22  change its land use designations.

23  88.    Below are some documented results of harvesting practices that are consistent with

24  P&G's "no deforestation" policy, although any reasonable consumer would understand these

25  practices—which transform carbon-rich and old-growth forests into clearcuts and young tree

26
27  ――――――――――――――――
[60] P&G's Forest Commodities Policy (May 2023),
28  https://s1.q4cdn.com/695946674/files/doc_downloads/esg/2023/P-G-Forest-Commodities-Policy-May-2023.pdf.

1  plantations—are consistent with the colloquial meaning of deforestation as understood by the

2  reasonable consumer.





15  89.    Also, as more fully explained below, P&G's Protect promise violates the FTC Green

16  Guides sections 260.2 ("Interpretation and substantiation of environmental marketing claims"),

17  260.3(c) ("Overstatement of Environmental Attribute") and 260.4 ("General Environmental Benefit

18  Claims"), and is therefore likely deceptive and misleading to consumers.

19  **2.    P&G's "Grow" promise is misleading because P&G's suppliers are
20  systematically converting old growth forests into industrial tree crops.**

21  90.    P&G's Grow messaging about replanting 1-2 trees for every tree used in its products

22  is designed to intentionally mislead reasonable consumers such as Plaintiffs and the putative class

23  members (and is likely to mislead such consumers) to believe that its P&G Paper Products suppliers

24  are converting the specific boreal forest areas logged with replanting activities that mimic the intact

25  ecosystem that was there before P&G's harvesting occurred. But P&G fails to disclose that, in

26  reality, its suppliers are replanting single-species conifers, evenly spaced, and with even ages. In

27  other words, instead of a primary forest with an intact ecosystem, the boreal forest is being converted

28  into monoculture tree crops or Frankenforests. P&G's suppliers also spray chemical herbicides like

aerial glyphosate spray (a key ingredient in Monsanto's Roundup product) to intentionally eliminate all growth other than just a handful of tree species most valuable for logging.[61] These Frankenforests degrade overall forest health, reduce biodiversity and alter the boreal forest's unique structure.[62] Moreover these Frankenforests have exponentially less carbon storage capability.[63]

91.    Below are photographs of a P&G Paper Products supplier's replanting efforts in the Waibigoon area in Northern Ontario after clearcutting the area several years ago. These photographs are a far cry from the lush, dense, forests depicted by P&G as part of its Grow promise. Even worse, this area has already been designated with a slash pile burn plan in 2025, which means that this permanently destructive cycle will begin again. For these reasons, P&G's commitment to Keep Forests as Forests is egregiously misleading.



92.    Also below is an example of some of the trees ostensibly replanted. For the wildlife left behind after the clear-cutting activities, these saplings provide little use for years and won't provide the same ecological value or biodiversity benefits for at least a few more decades (unless, of course, P&G suppliers decide to clear cut the area again).

---

[61] *How Glyphosate Herbicide is Used to Poison Forests – And What You Can Do*, GREENPEACE (July 29, 2021), https://www.greenpeace.org/canada/en/story/49427/how-glyphosate-herbicide-is-used-to-poison-forests-and-what-you-can-do/.

[62] Charlie Jaay, *Monoculture, for-profit plantations, and the health of forests*, AIR QUALITY NEWS (Dec. 1, 2022), https://airqualitynews.com/features-opinion/monoculture-for-profit-plantations-and-the-health-of-forests/.

[63] Sarah Ruiz, *What you should know about protecting the United States' old forests*, WOODWELL CLIMATE RESEARCH CTR. (June 1, 2023), https://www.woodwellclimate.org/protect-us-mature-and-old-growth-forests/.



**3.    P&G's "Restore" promise is misleading as P&G intends to replace less than 1% of lands harvested in Canada's boreal forests.**

93.    Finally, regarding its "Restore" promise, P&G touts its partnership with the Arbor Day Foundation to plant a total of one million trees in forests affected by natural disasters. But studies show that one million **acres of trees** are clearcut from Canada's boreal forests each year.[64]

94.    Assuming that there are approximately 100-200 trees per acre of boreal forest, that means that P&G's restoration efforts impact an area less than 1% of boreal forest lost each year to industrial logging practices. Not only does this make P&G's promise of "restoring" the boreal forest egregiously deceptive and misleading to consumers, P&G also violates Example 1 of section 260.3 (c) of the FTC Green Guides by overstating an environmental benefit.

**4.    P&G also misleads consumers at point-of-sale with unauthorized and improper use of third-party logos.**

95.     Below is an infographic from the FSC showing which logos and statements a company should use to reflect the appropriate level of commitment to responsible forest management:

---

[64] *Threatened by logging, the boreal forest needs our help*, ENVIRONMENT AMERICA (Sept. 27, 2022), https://environmentamerica.org/articles/threatened-by-logging-the-boreal-forest-needs-our-help.



96.    As explained below, P&G makes two deceptive claims to consumers.

        **a.    P&G's statement that its P&G Paper Products pulp is 100% derived from FSC-certified forests is false.**

97.    P&G consistently and unambiguously uses the unqualified FSC logo on its front package, which leads reasonable consumers to believe that the entire product shares the same environmental benefit. P&G also claims, 100% of its pulp is sourced from FSC-certified forests:

## Product Details



Get sparkly clean with Charmin Ultra Strong. Its 4X stronger when wet and has a diamond-weave texture. Its woven like a washcloth and holds up when you wipe. It even cleans better so you can use less and go longer without changing the roll. We also made it MEGA in size, so you get mega value. Thats right, our Charmin Ultra Strong Mega Roll is way bigger, equals 4 regular rolls, and its more bang for your behind so youll be running back to the store less and less (based on number of sheets in Charmin Regular Roll bath tissue). Our Charmin Ultra Strong toilet paper is also 2-ply and designed to be clog-safe and septic-safe so you can flush confidentially and keep clean. And at Charmin, we love trees so we work hard to protect, grow and restore forests. Its why all our pulp used is 100% FSC certified. Its why we plant two trees for every one used. And its why we help to restore forests devastated by natural disaster through the Arbor Day Foundation. Thats how were helping keep forests, forests. We all go, why not Enjoy The Go with Americas favorite toilet paper.

1    98.    These statements are deceptive because P&G acknowledges in its own Forestry

2    Practices report that "the availability of FSC-certified pulp [in Canada] is insufficient to meet the

3    demands of our industry."[65] It is therefore impossible for 100% of P&G Paper Products to be derived

4    from FSC-certified forests. P&G's actions violate sections 260.3(c) ("Overstatement of

5    Environmental Attribute") and 260.2 ("Interpretation and Substantiation of Environmental

6    Marketing Claims") of the FTC Green Guides and are therefore likely deceptive and misleading to

7    consumers.

8    99.    Moreover, because it is impossible for 100% of P&G Paper Products pulp to be

9    derived from FSC-certified forests, P&G now relies on wood pulp certifications from other third-

10   party certifiers such as the Sustainable Forestry Initiative ("SFI") and the Programme for the

11   Endorsement of Forest Certification ("PEFC"). SFI was founded in 1994 by the American Forest &

12   Paper Association, a wood and paper products trade association, while PEFC was initially founded

13   by forest owners.

14   100.    SFI has been the target of multiple FTC complaints because it is substantially

15   governed and financed by the timber industry and its ambiguous forestry standards are developed

16   and approved by timber industry personnel in a closed process.[66] In addition, the Competition Bureau

17   (an independent law enforcement agency established by the Government of Canada) launched an

18   official investigation into the Sustainability Forestry Initiative in 2023 to determine to whether SFI

19   is falsely claiming its logging practices are sustainable.

20

21

22

23

---

24   [65] P&G Forestry Practices Report (Mar. 2021),
25   https://s1.q4cdn.com/695946674/files/doc_downloads/esg/2021/ForestryPracticesReport_FINAL-TO-POST-MARCH-2021-Updated.pdf.
26   [66] *RELEASE: ForestEthics Files Complaint in Federal Trade Commission (FTC) Charging that the "Sustainable Forestry Initiative" Violates FTC's New Green Guides*, ENVIRONMENTAL PAPER
27   NETWORK (May 28, 2013), https://environmentalpaper.org/2013/05/release-forestethics-files-complaint-in-federal-trade-commission-ftc-charging-that-the-sustainable-forestry-initiative-violates-ftcs-new-green-guides/.

101.    Not surprisingly then, both SFI and PEFEC have been criticized as weak[67] and ineffective[68] at certifying and enforcing responsible forest management practices. Because of these issues, Defendant's reliance on SFI and PEFEC certifications to convey an overall impression of independent certification of responsible forest management is deceptive.

102.    Moreover, as explained more fully below, P&G's actions are similar to Examples 2 and 4 of section 260.6 ("Certifications and Seals of Approval") of the FTC Green Guides and therefore likely deceptive and misleading to consumers.

### b.    P&G's use of the FSC Mix logo is also misleading.

103.    Due to the lack of FSC-certified forests in Canada's boreal, P&G also began to rely on the watered-down FSC "CW" (controlled wood) designations. This designation refers to companies that use both FSC-certified *and* non-FSC-certified material in their supply chains. According to both the FSC and section 260.6 of the FTC Green Guides, P&G should use the FSC Mix label on its product packaging *and* display this logo in a clear and prominent place on the *front* of the packaging to not be deceptive. Instead, P&G displays a large unqualified FSC logo in a clear and prominent place on the *front* of P&G Paper Products packaging, while displaying the FSC Mix logo in much smaller font *on the back and bottom* part of the packaging. Compare the prominent placing and large font of the unqualified FSC logo on the front label of Charmin Toilet Paper with the tiny, fine print, FSC Mix logo located on at the bottom of its back label:

 

---

[67] *Greenpeace, RAN warn of forest certification greenwash*, GREENPEACE (June 24, 2015), https://www.greenpeace.org/southeastasia/press/591/greenpeace-ran-warn-of-forest-certification-greenwash/.

[68] Dina Ni, *Competition Bureau launches investigation into greenwashing complaint against North America's largest forest certification scheme*, GREENPEACE (Jan. 31, 2023), https://www.greenpeace.org/canada/en/press-release/57244/competition-bureau-launches-investigation-into-greenwashing-complaint-against-north-americas-largest-forest-certification-scheme/.

c.     **P&G continues to misuse and mislead consumers regarding its Rainforest Alliance logos and claims.**

104.    In 2016, P&G began sourcing pulp from forests certified by the Rainforest Alliance and started featuring the "Rainforest Alliance Certified" seal on Charmin and Puffs Tissues packages. And even today, P&G continues to use the "Rainforest Alliance Certified" seal when referencing its Charmin and Puffs products on the Charmin Sustainability Promise website.[69] P&G's continued use of this seal is misleading, however, because P&G does not disclose that the "Rainforest Alliance Certified" seal is now obsolete.

105.

106.    According to the Rainforest Alliance, "Rainforest Alliance Certified" was a sustainability certification program and its seal indicated that a product had met rigorous sustainability standards. However, in 2018, the Rainforest Alliances' Certification Unit was acquired by Preferred by Nature and therefore Rainforest Alliance no longer directly certifies businesses against responsible forestry standards. And as of September 30, 2023, the license agreements terminated meaning that businesses are not able to use the Rainforest Alliance Certified seal on the certified products or related promotional materials.[70]



---

[69] *Webinar on Promoting Consumer Engagement with Forest Sustainability*, FSC INTERNATIONAL (Nov. 19, 2021), https://www.youtube.com/watch?v=BFB0J3jQlkw, at 24:00.

[70] Kataryzyna Nagrodzka, *Rainforest Alliance Certified seal phase-out for old RA-Cert clients*, Preferred by Nature (Nov. 17, 2021), https://www.preferredbynature.org/news/rainforest-alliance-certifiedtm-seal-phase-out-old-ra-cert-clients.

107.    In contrast, the "Rainforest Alliance Forest Allies" seal has no certification process. The "Forest Allies" program also does not perform any audits of any parts of the P&G Paper Products supply chain. Instead, "Forest Allies" is simply a community of practice that supports forest communities located in the tropics.

108.    Forest Allies was launched in 2021, and P&G is one of two founding members of this program. As a founding member of Forest Allies, P&G is only required to pay annual dues to Rainforest Alliance and in exchange can use an altered, but nearly identical seal, for three years at a cost of $250,000 a year.[71]

109.    As explained above, P&G continues to use the Rainforest Alliance Certified seal on its Charmin Sustainability Promise website, in direct violation of the Rainforest Alliance policy.[72] And while P&G has altered its Paper Products packaging to only include the "Forest Allies" seal, which makes no claims as to the product's provenance or certification, it is practically identical to the previous seal and therefore highly likely to mislead consumers because the Forest Allies program does not conduct any activities in Canada's boreal forest. These practices violate section 260.2 of the FTC Green Guides and are likely deceptive and misleading to consumers.

110.    Moreover, because P&G is one of only two founding members of the Rainforest Alliance Forest Allies program, it is unlikely that the program can meet the FTC Green Guide's voluntary consensus standard bodies criteria[73] and therefore use of this seal to convey third party certification is similar to Example 4 of section 260.6 of the FTC Green Guides and likely deceptive and misleading to consumers.

---

[71] Milana Nikolova, *P&G accused of "greenwashing" and "misleading" consumers with on-pack sustainability claims*, PACKAGING INSIGHTS (Jan. 22, 2025), https://www.packaginginsights.com/news/pg-accused-of-greenwashing-and-misleading-consumers-with-on-pack-sustainability-claims.html.

[72] *Using our logo and seal*, Rainforest Alliance (Dec. 11, 2024), https://www.rainforest-alliance.org/business/marketing-sustainability/using-our-logo-and-seal/.

[73] Identified in FN 45 of the FTC Green Guides and originally found in Memorandum for Heads of Executive Departments and Agencies on Federal Participation in the Development and Use of Voluntary Consensus Assessment Activities (Feb. 10, 1998), Circular No. A-119 Revised, Office of Management and Budget, http://www.whitehouse.gov/omb/circulars_a119.

I.     **P&G's Keep Forests as Forests campaign and P&G Paper Products packaging violates the FTC Green Guides.**

111.    Through packaging, storefront signage, and multilayered marketing practices, P&G's Keep Forests as Forestscampaign creates an overall impression of environmental sustainability that violates several portions of the FTC Green Guides. Below are some examples.

112.    First, P&G's "Protect" promise conveys to a reasonable consumer that P&G Paper Products are environmentally sustainable because they are made exclusively from pulp certified by the FSC. But only a small fraction of P&G Paper Products' pulp is derived from FSC-certified forests and its suppliers use industrial logging practices such as clearcutting and burning. As such, P&G's actions violate the FTC Green Guides sections 260.2 ("Interpretation and substantiation of environmental marketing claims"), 260.3(c) ("Overstatement of Environmental Attribute"), and 260.4 ("General Environmental Benefit Claims") and are therefore likely deceptive and misleading to consumers.

113.    Next, for its "Grow" promise, P&G promises that "for every tree used at least two are regrown in its place,"[74] which conveys to reasonable consumers the overall impression that P&G is mitigating the environmental harm caused by its harvesting of wood pulp by helping to replace the original biodiversity and ecological value of the forest harvested it uses via thoughtful and effective replanting efforts.

114.    In reality, P&G's supply chain is planting trees in monoculture tree crops that lack any of the ecological value (and environmental benefit) from the primary forests that P&G suppliers harvested. As such, P&G's "Grow" promise is similar to Example 3 of section 260.3(c) ("Overstatement of Environmental Attribute"). Additionally, P&G's claim to regrow two trees for every one it uses is virtually impossible to verify given the information the company has shared with investors. Nowhere does the company share how it verifies the trees are regrown, where they are regrown, and how long they monitor the trees to ensure they do, in fact, grow and reach maturity to the extent the harvested forest's ecological value is returned. As such, P&G violates section 260.2

---

[74] *Friend of the Forest Award 2018 | Charmin & Arbor Day Foundation*, CHARMIN, https://youtu.be/DPMpB_ZmC4U, at 1:01.

1    ("Interpretation and Substantiation of Environmental Marketing Claims") of the FTC Green Guides,

2    which requires markets to provide scientific evidence to justify its claims *before* making these claims

3    to the public.

4         115.    As for its "Restore" promise, P&G touts its partnership with the Arbor Day

5    Foundation to plant one million trees in forests affected by natural disasters and conveys to

6    reasonable consumers the overall impression that P&G supply chain is a net environmental benefit.

7    But studies show that one million acres of trees are clearcut from Canada's boreal each year.

8    Assuming that there are approximately 100-200 trees per acre of boreal forest, that means that P&G's

9    total years-long promise to replant one million trees represents less than 1% of boreal forest lost to

10   industrial logging practices each year. As such, P&G's "Restore" promise is similar to Example 1

11   of section 260.3(c) ("Overstatement of Environmental Attribute") and therefore likely to be

12   deceptive and misleading. P&G's conduct also violates the FTC Green Guides sections 260.2

13   ("Interpretation and substantiation of environmental marketing claims") and 260.4 ("General

14   Environmental Benefit Claims") and is therefore likely deceptive and misleading to consumers.

15        116.    P&G's use of logos also violates the Green Guides and is therefore likely deceptive

16   and misleading. For example, P&G uses the unqualified FSC logo in its packaging, even though it

17   acknowledges that only a small fraction of P&G Paper Products wood pulp is derived from FSC-

18   certified forests. This is similar to Examples 2, 6, and 7 of section 260.6 ("Certifications and Seals

19   of Approval") of the FTC Green Guides. P&G also delegates the qualifying "FSC Mix" logo

20   language to the fine print at the bottom/back of Charmin and Puffs packaging. This violates FSC's

21   own instructions on logo use, as well as the Green Guide guidance at section 260.3(a) to publish any

22   qualifications or disclosures in a clear and prominent area. P&G's certification claims also directly

23   overstate the environmental attribute or benefit of using P&G Paper Products and therefore violates

24   section 260.3(c) ("Overstatement of environmental attribute") of the FTC Green Guides.

25        117.    P&G also uses the Rainforest Alliance certification logo on its Charmin

26   Sustainability Promise website, even though the Rainforest Alliance no longer certifies P&G Paper

27   Products and that its wood pulp is not sourced from FSC-certified forests. As such P&G's

28   certification claims directly overstate the environmental attribute or benefit of using P&G Paper

1    Products and therefore violates section 260.3(c) ("Overstatement of environmental attribute") of the

2    FTC Green Guides. Similarly, by adopting substantially similar logos without qualification or

3    disclosure, P&G violates section 260.3(a) ("Qualifications and disclosures") as well as section 260.6

4    ("Certifications and Seals of Approval") of the FTC Green Guides.

5         118.    Additionally, P&G's Sustainability Promise websites—which prominently feature

6    the environmental benefits and ecological value of old-growth forests, along with a consistent

7    depiction of lush dense forests, in addition to text that uses the phrases like "Keep Forests as Forests,"

8    likely conveys that P&G is committed to replacing trees in a manner that attains the same level of

9    biodiversity and ecological value in the same location where the old-growth forests were harvested.

10    This in turn helps to convey that the P&G Paper Products supply chain has no lasting negative

11    environmental impact. Because it is highly unlikely that P&G can substantiate these claims using

12    scientific evidence, the Protect-Grow-Restore messaging and Sustainability Promise websites are

13    substantially similar to Example 3 of section 260.4 ("General Environmental Benefit Claims") of

14    the FTC Green Guides. And because these representations are negligible claims at best when

15    compared to the devastating clearcutting, burning, and Frankenforest practices condoned by P&G,

16    the Protect-Grow-Restore claim and Sustainability Promise websites are substantially similar to

17    Example 1, and therefore P&G also violates section 260.3(c) ("Overstatement of environmental

18    attribute") of the FTC Green Guides.

19         119.    Moreover, almost all of P&G's Greenwashing campaign claims are encompassed in

20    the list of greenwashing tactics commonly used by deceptive marketers:[75]

21

22

23

24

25

26

27

28    [75] *What is Greenwashing? Exposing Deceptive Tactics*, FSC (Oct. 7, 2024), https://fsc.org/
    en/blog/what-is-greenwashing.

- *Vague or unsubstantiated claims*: P&G deceptively claims that it regrows two trees for every one it uses;

- *Hidden trade-offs*: P&G deceptively claims that it regrows two trees for every one it uses;

- *Untrustworthy certifications*: P&G's deceptive use of the obsolete Rainforest Alliance certification logo and the substantially similar logos of the FSC and Rainforest Alliance.

**J.    P&G has repeatedly promised to fulfill its promises, or to stop making misleading claims, but has failed to do so.**

120.    P&G was previously confronted with its environmentally devastating practices, but so far has refused to acknowledge any responsibility or take any concrete steps remediate its supply chain practices so they align with P&G's environmental promises to consumers.

121.    For example, in October 2019, after giving Charmin Toilet Paper and Puffs Tissues each an "F" for its environmental impact in its annual toilet paper and tissue sustainability report, the National Resources Defense Council ("NRDC") protested a P&G shareholder meeting to urge the company to stop sourcing its wood pulp from Canada's boreal forest and instead increase its

1  reliance on recycled fibers. Then, in 2020, Green Century Equity Fund called on the company to
2  report on how and whether it can eliminate Deforestation and intact Forest Degradation.[76] According
3  to the Green Century shareholder proposal, P&G "lags on implementing its existing no-deforestation
4  commitment [and] lacks a comprehensive plan to mitigate exposure to deforestation and forest
5  degradation throughout its operations." In response, about 67% of P&G's shareholders voted in
6  favor of the proposal that asked P&G to "issue a report assessing if and how it could increase the
7  scale, pace, and rigor of its efforts to eliminate deforestation and the degradation of intact forests in
8  its supply chains."

9      122.    Since then, P&G's own shareholders (including dozens of descendants of the
10  founders of P&G) have criticized P&G's lack of initiative (let alone progress) in developing an
11  actionable plan. For example, in their September 8, 2023 letter to shareholders, which was filed with
12  the SEC, the P&G descendants wrote that: "the company has delivered weak and internally
13  inconsistent policy and issued statements that obfuscate the continued risk associated with its
14  procurement of forest commodities, leaving the company's actions to address forest risk incoherent
15  and inadequate." Moreover, the P&G descendants also concluded that: "we are deeply concerned
16  that P&G is not effectively communicating a coherent policy regarding the highly material risks
17  caused by supply chain deforestation and forest degradation" and that P&G has "yet to deliver a
18  credible policy and time-bound plan to eliminate deforestation and primary forest degradation."

19      123.    P&G also still lacks an effective enforcement mechanism for non-compliance
20  protocols that transparently articulate what thresholds and metrics it will use to measure compliance
21  and non-compliance with its policies; what supplier actions would trigger supplier suspension or
22  exclusion from the company's supply chain; and what steps a supplier would need to take to re-enter
23  the company's supply chain. Experts agree that without these enforcement tools, any proposed
24  deforestation or degradation mitigation measures would prove ultimately ineffective.[77]

25

26

---

27  [76] This vote approving the resolution was all the more stunning as P&G's Board of Directors had recommended that shareholders oppose it.
28  [77] FAO/ITTO publication, https://www.fao.org/4/a0146e/A0146E04.htm.

124.    As such, P&G has not taken any serious steps, or developed any actionable plan, to measure, evaluate, or improve upon its current supply chain practices.

**K.    P&G has actively concealed the truth about its environmental claims from consumers.**

125.    P&G actively and knowingly concealed from and failed to disclose to Plaintiffs and the Class members that the P&G Paper Products are not environmentally sustainable as described in this Complaint.

126.    P&G actively and knowingly concealed and failed to disclose material facts to Plaintiffs and the Class about the true impact of the P&G Paper Products' supply chain on the environment, including that:

- P&G sources its wood pulp via industrial logging practices such as clearcutting and burning of Canada's boreal forest;

- P&G suppliers are systematically converting critically important old-growth forests into environmentally devastating Frankenforests;

- Only a fraction of P&G's sourced wood pulp is from FSC-certified forests; and

- P&G uses unauthorized and improper third-party logos, including use of the Rainforest Alliance Certified seal on its Sustainability Promise website, even though the seal is obsolete.

127.    Despite P&G's environmental and sustainability claims, its supply chain policies and lack of enforcement procedures allowed sourcing that further contributed to Deforestation and Forest Degradation, including from Canada's boreal forest.[78] The 2020 Shareholder Resolution requested that P&G issue a report on its efforts on environmental sustainability. Yet, notably, P&G's Board of Directors opposed the proposal that would have communicated P&G's efforts to measure and achieve its sustainability goals.

128.    Three years later, shareholder descendants of P&G's founders publicly expressed concern over the company's lack of action and asked P&G to "deliver a credible policy and time-bound plan to eliminate deforestation, primary forest degradation, and human rights violations from

---

[78] *2020 P&G Proxy Statement, Shareholder Proposals: Item 5. Shareholder Proposal – Report on Efforts to Eliminate Deforestation*, P&G, https://s1.q4cdn.com/695946674/files/doc_financials/2020/ar/PG-Bookmarked-Proxy-Statement.pdf, at 78.

1    its supply chains, applied at the corporate group level, and paired with a robust non-compliance

2    protocol."[79]

3        129.    P&G responded to the descendants' and shareholders' concern by continuing to

4    actively conceal the truth. While P&G reiterated its commitment to environmental sustainability and

5    "responsible forestry sourcing practices,"[80] it continued to source from both primary forests and

6    boreal caribou habitat.[81]

7        130.    P&G knowingly and actively concealed the material facts because it knew consumers

8    cared about the environment and that if they were to learn the truth about P&G's greenwashing, it

9    would negatively affect P&G's finances. Indeed, according to the Business Operations Risks section

10   in P&G's Form 10-K filings filed every year since at least 2013, P&G acknowledged that it "devotes

11   significant time and resources to programs designed to protect and preserve our reputation, such as

12   social responsibility and environmental sustainability" and that if P&G is "unable to effectively

13   manage real or perceived issues . . . . our financial results could suffer."[82]

14       131.    The knowing and active concealment of these material facts render the Products'

15   packaging deceptive, misleading, and unfair because without full disclosure, reasonable consumers,

16   including Plaintiffs, believe the P&G Paper Products to be environmentally sustainable and to have

17   environmental benefits.

18

19

20

21   [79] Letter from descendants of P&G's founders and shareholders in response to P&G response to
     Sept. 8, 2023 letter, dated Sept. 28, 2023, filed with the SEC,
22   https://d18rn0p25nwr6d.cloudfront.net/CIK-0000080424/68693175-54ef-4490-9912-
     0998112e8e98.pdf.
23   [80] Response from P&G to Sept. 8, 2023, letter from P&G descendants and shareholders, dated
     Sept. 20, 2023, filed with the SEC,
24   https://www.sec.gov/Archives/edgar/data/80424/000008042423000078/pgcommitrespforestry.htm.
25   [81] Letter from descendants of P&G's founders and shareholders in response to P&G response to
     Sept. 8, 2023 letter, dated Sept. 28, 2023, filed with the SEC,
26   https://d18rn0p25nwr6d.cloudfront.net/CIK-0000080424/68693175-54ef-4490-9912-
     0998112e8e98.pdf.
27   [82] P&G 2013 Form 10-K,
     https://www.sec.gov/Archives/edgar/data/80424/000008042413000063/fy201310kannualreport.ht
28   m.

1    132.    Plaintiffs and the Class members paid a premium price based on P&G's active

2    concealment, omissions, and misrepresentations regarding the environmental and sustainability

3    marketing claims.

4    133.    The facts concealed, omitted, or not disclosed by P&G were material facts that

5    reasonable consumers, including Plaintiffs, would have considered them when deciding whether to

6    purchase P&G Paper Products. Had Plaintiffs known the truth, they would not have purchased the

7    P&G Paper Products or paid the premium price.

8    **L.    P&G's competitors demonstrate that more sustainable practices are possible.**

9    134.    P&G is ceding competitive advantage to its peers for its failure to meet its no-

10   Deforestation commitment and continued use of primary forest fiber in its tissue products. For

11   example, P&G's competitor Kimberly-Clark has committed to halving its sourcing from natural

12   forests by 2025. P&G was also rated below its peers by both Forest 500 and CDP Forest in terms of

13   the strength of its commitments, reporting, and implementation in ensuring deforestation-free supply

14   chains. Kimberly-Clark has also purchased a higher percentage of FSC-certified fiber (*i.e.*, not

15   including Controlled Wood) than P&G in each of the last three years.

16   135.    P&G also incorporates zero recycled materials into the manufacturing of its Paper

17   Products, which is in significant contrast with other major tissue manufacturers such as Whole Foods

18   365, Trader Joe's, and Seventh Generation.

19   136.    NRDC released *The Issue with Tissue* Sixth Edition scorecard in 2024, which shows

20   movement among the industry's biggest players toward greater sustainability. Still, Procter &

21   Gamble (P&G) remains stuck in the past, rejecting demands from consumers and shareholders alike

22   to end its almost exclusive use of forest fiber for P&G Paper Products and its other flagship tissue

23   brands. P&G remains the only one of the three largest U.S. toilet paper producers to earn F grades

24   for its Charmin Toilet Paper and Puffs Tissues across all six editions of NRDC's scorecard[83]:

25

26

27

28   _____

[83] The Issue with Tissue, NRDC (Sept. 16, 2024), https://www.nrdc.org/resources/issue-tissue.

## V.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Discovery Rule Tolling

137.   Class members had no way of knowing about P&G's deception with respect to the environmental sustainability of the P&G Paper Products supply chain. To be sure, P&G continues to this day to make the same claims that it Protect-Grow-Restore the trees in the boreal forest, and that the pulp it purchases is sustainably sourced, all while actively promoting their obsolete and misleading sustainability credentials on the packaging itself.

138.   Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered through the exercise of reasonable diligence that P&G was concealing the conduct complained of herein and was misrepresenting the Company's true position with respect to the environmental stewardship of its P&G Paper Products supply chain.

139.   Plaintiffs and the other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that P&G was hiding from consumers material information about the environmental harm caused by its supply chains for P&G Paper Products; nor would a reasonable and diligent investigation have disclosed this information, which

was discovered by Plaintiffs only shortly before this action was filed. Nor in any event would such an investigation on the part of Plaintiffs and other Class members have disclosed that P&G valued profits over truthful marketing and compliance with law.

140.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims alleged herein.

**B.    Fraudulent Concealment Tolling**

141.    All applicable statutes of limitation have also been tolled by P&G's knowing and active fraudulent concealment, omissions, and suppressions and denial of the facts alleged herein throughout the period relevant to this action.

142.    Instead of disclosing the environmentally devastating P&G Paper Products supply chain, or that the quality and quantity of replanted forests was far worse than represented, P&G chose instead to tout its environmental bona fides via its websites and the packaging used for P&G Paper Products.

**C.    Estoppel**

143.    After consistently touting its environmental stewardship, P&G was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the harvesting and replanting efforts within the P&G Paper Products supply chain.

144.    P&G knowingly, affirmatively, and actively concealed, omitted, or suppressed, or recklessly disregarded the true character, quality, and nature of the harvesting and replanting efforts within the P&G Paper Products supply chain.

145.    Based on the foregoing, P&G is estopped from relying on any statutes of limitations in defense of this action.

**VI.    CLASS ALLEGATIONS**

146.    Plaintiffs bring this action on behalf of themselves and all those similarly situated, as a class action pursuant to the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

All persons who purchased a P&G Paper Product between January 16, 2021, and January 16, 2025, in the state of California.

147.    Excluded from the Class are P&G and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

148.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

149.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

150.    <u>Numerosity.</u> Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that annual sales of Charmin Toilet Paper and Puffs Tissues are estimated to be $3 billion and that P&G spends around $119 million each year in advertising for the Charmin brand in the United States. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, email, text messages, social media, Internet postings, and/or published notice.

151.    <u>Commonality and Predominance.</u> Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a)    Whether P&G engaged in the conduct alleged herein;

b)    Whether P&G designed, advertised, marketed, distributed, sold, or otherwise placed P&G Paper Products into the stream of commerce in the United States;

c)    Whether P&G sources its P&G Paper Products from the boreal forest in Canada;

d)    Whether P&G made specific claims to consumers of environmental stewardship regarding the supply chain for P&G Paper Products;

e)      Whether P&G knew about the highly destructive industrial logging practices taking place in its supply chain for P&G Paper Products and, if so, how long P&G has known of the issue;

f)      Whether P&G knew that replanting efforts in the boreal forest are mainly for future harvesting purposes and do not recreate the same level of ecological value and carbon capture capability characteristic of the trees previously harvested and, if so, how long P&G has known of the issue;

g)      Whether P&G's conduct violates consumer protection statutes, the common law of fraudulent concealment, and other laws as asserted herein;

h)      Whether P&G knew or should have known of the industrial logging and replanting issues inherent in the P&G Paper Products supply chain;

i)      Whether Plaintiffs and the other Class members overpaid for their P&G Paper Products as a result of the fraud alleged herein;

j)      Whether Plaintiffs and the other Class members are entitled to equitable relief; and

k)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

152.    Typicality. Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through P&G's wrongful conduct as described above.

153.    Adequacy. Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class each respectively seeks to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

154.    Declaratory and Injunctive Relief. Federal Rule of Civil Procedure 23(b)(2): By representing that P&G Paper Products are environmentally friendly while also omitting the

significant Forest Degradation that the sourcing of wood pulp for P&G Paper Products generates, P&G has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, with respect to the Class as a whole.

155.    Superiority. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against P&G, so it would be impracticable for Class members to individually seek redress for P&G's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.    CLAIMS FOR RELIEF

### A.    Claims brought on behalf of the California Class

### COUNT I
### VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
### (Cal. Civ. Code § 1750, *et seq.*)

156.    Plaintiffs Alzaidi, Chornomud, and Cuevas incorporate by reference all preceding allegations as though fully set forth herein.

157.    Plaintiffs Alzaidi, Chornomud, and Cuevas bring this Count on behalf of the California Class.

158.    California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

159.    Charmin Toilet Paper, Puffs Tissues, and P&G Paper Products are "goods" as defined in Cal. Civ. Code § 1761(a).

160.    Plaintiffs and the other California Class members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs, the other California Class members, and Defendant are "persons" as defined in Cal. Civ. Code § 1761(c).

161.    Affidavits for Plaintiffs Alzaidi and Cuevas pursuant to Cal. Civ. Code § 1780(d) are attached hereto. Plaintiff Chornomud's affidavit is forthcoming.

162.    In purchasing P&G Paper Products, Plaintiffs and the other California Class members were deceived by Defendant's marketing of P&G Paper Products as environmentally sustainable products, and obtaining money from Plaintiffs and California Class members, while also failing to disclose that:

- P&G sources its wood pulp via industrial logging practices such as clearcutting and burning;

- P&G suppliers are systematically converting critically important old-growth forests into environmentally devastating Frankenforests;

- Only a small fraction of its wood pulp is sourced from FSC-certified forests;

- Defendant's improper use of third-party logos, seals, and certifications (e.g. FSC and Rainforest Alliance logos and seals);

- Defendant's continuing violations of federal guidance on environmental marketing claims, e.g., the FTC Green Guides; and,

- Defendant's continuing violations of other California laws, including Cal. Civ. Code §§ 1709, 1710, and 1750, *et seq.*, and Cal. Com. Code § 2313.

163.    Defendant's conduct, as described hereinabove, was and is in violation of the CLRA. Defendant's conduct violates at least Cal. Civ. Code § 1770(a)(16) (representing that goods have been supplied in accordance with a previous representation when they have not).

164.    Plaintiff and the other California Class members have suffered injury in fact and actual damages resulting from Defendant's material omissions and/or misrepresentations because they paid an inflated purchase price for P&G Paper Products.

165.    Defendant knew, should have known, or was reckless in not knowing of the material omissions and/or misrepresentations.

166.    The facts concealed and omitted by Defendant to Plaintiffs and the other California Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase P&G Paper Products or pay a lower price. Had Plaintiffs and the other California Class members known about the material omissions and/or misrepresentations they would not have purchased P&G Paper Products or would not have paid the prices they paid in fact.

167.    Plaintiff has provided P&G with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a). The notice was transmitted to P&G on January 13, 2025.

168.    Plaintiffs and the other California Class members' injuries were proximately caused by P&G's fraudulent and deceptive business practices.

169.    Therefore, Plaintiffs and the other California Class members are entitled to equitable relief and will amend this action and seek monetary relief under the CLRA.

## COUNT II
## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200, *et seq.*)

170.    Plaintiffs Alzaidi, Chornomud, and Cuevas incorporate by reference all preceding allegations as though fully set forth herein.

171.    Plaintiffs Alzaidi, Chornomud, and Cuevas bring this Count on behalf of the California Class.

172.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

173.    P&G's conduct, as described herein, was and is in violation of the UCL in at least the following ways:

i.    By knowingly and intentionally concealing from Plaintiffs and the other California Class members that (i) P&G sources its wood pulp via industrial logging practices such as clearcutting and burning; (ii) P&G suppliers are systematically converting critically important old-growth forests into environmentally devastating Frankenforests; (iii) only a fraction of its wood pulp is sourced from FSC-certified forests; and (iv) P&G uses unauthorized and improper third-party logos, including use of the Rainforest Alliance Certified seal on its Sustainability Promise

website, even though the seal is obsolete, while obtaining money from Plaintiffs and California Class members;

ii.     By marketing P&G Paper Products as environmentally sustainable;

iii.    By violating federal guidance, such as the FTC Green Guides; and

iv.     By violating other California laws, including Cal. Civ. Code §§ 1709, 1710, and 1750, *et seq.*, and Cal. Com. Code § 2313.

174.    P&G's omissions, concealment, and/or misrepresentations alleged herein caused Plaintiffs and the other California Class members to make their P&G Paper Products purchases. Absent those omissions and/or misrepresentations, Plaintiffs and the other California Class members would not have purchased P&G Paper Products, or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other California Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

175.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by P&G under Cal. Bus. & Prof. Code § 17200.

176.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin P&G from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the California Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345; and for such other relief set forth below.

## COUNT III
## VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code § 17500, *et seq.*)

177.    Plaintiffs Alzaidi, Chornomud, and Cuevas incorporate by reference all preceding allegations as though fully set forth herein.

178.    Plaintiffs Alzaidi, Chornomud, and Cuevas bring this Count on behalf of the California Subclass.

179.    Cal. Bus. & Prof. Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated …

1   from this state before the public in any state, in any newspaper or other publication, or any
2   advertising device, … or in any other manner or means whatever, including over the Internet, any
3   statement … which is untrue or misleading, and which is known, or which by the exercise of
4   reasonable care should be known, to be untrue or misleading."

5        180.    P&G has violated Cal. Bus. & Prof. Code § 17500 because the omissions and/or
6   misrepresentations regarding the environmental sustainability of P&G Paper Products as set forth in
7   this Complaint were material and likely to deceive a reasonable consumer.

8        181.    Plaintiff and the other California Class members have suffered an injury in fact,
9   including the loss of money or property, as a result of P&G's unfair, unlawful, and/or deceptive
10  practices. In purchasing P&G Paper Products, Plaintiff and the other California Class members relied
11  on the omissions and/or misrepresentations of P&G with respect to environmental sustainability of
12  P&G Paper Products. P&G's representations turned out not to be true because P&G Paper Products'
13  supply chain relies on industrial logging practices that are destroying primary forests and P&G has
14  improperly used various third-party logos, seals, and certifications. Had Plaintiffs and the other
15  California Class members known this, they would not have purchased P&G Paper Products and/or
16  paid as much for these products. Accordingly, Plaintiff sand the other California Class members
17  overpaid for their P&G Paper Products and did not receive the benefit of their bargain.

18       182.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the
19  conduct of P&G's business. P&G's wrongful conduct is part of a pattern or generalized course of
20  conduct that is still perpetuated and repeated, both in the State of California and nationwide.

21       183.    Plaintiffs, individually and on behalf of the other California Class members, request
22  that this Court enter such orders or judgments as may be necessary to enjoin P&G from continuing
23  their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the other California
24  Class members any money P&G acquired by unfair competition, including restitution and/or
25  restitutionary disgorgement, and for such other relief set forth below.

26

27

28

1

2

**COUNT IV**
**FRAUDULENT CONCEALMENT**
**(Based on California Law)**

3        184.    Plaintiffs Alzaidi, Chornomud, and Cuevas incorporate by reference all preceding

4    allegations as though fully set forth herein.

5        185.    Plaintiffs Alzaidi, Chornomud, and Cuevas bring this Count on behalf of the

6    California Subclass.

7        186.    P&G intentionally concealed and suppressed material facts regarding its P&G Paper

8    Products. These material facts included that (i) P&G sources its wood pulp via industrial logging

9    practices such as clearcutting and burning; (ii) P&G suppliers are systematically converting critically

10   important old-growth forests into environmentally devastating Frankenforests; (iii) only a fraction

11   of its wood pulp is sourced from FSC-certified forests; and (iv) P&G uses unauthorized and improper

12   third-party logos, including use of the Rainforest Alliance Certified seal on its Sustainability Promise

13   websites, even though the seal is obsolete.

14       187.    Despite the 2020 Shareholder Resolution and clear desire by the shareholders and

15   investors that P&G change its sourcing practices and eliminate deforestation and forest degradation

16   and P&G's public commitment to environmental sustainability and responsible forestry sourcing

17   practices, the company continued to source from primary forests and boreal caribou habitat, material

18   facts it concealed from Plaintiffs and the California Class.

19       188.    P&G voluntarily represented that its P&G Paper Products were environmentally

20   sustainable and therefore is required to make a full and fair disclosure under California law. P&G

21   therefore had a duty to disclose the material facts as additional information in order to make its

22   Sustainability Promise website (as well as P&G's other environmental claims including on its P&G

23   Paper Products packaging) not misleading. P&G also knew that these representations were false

24   when made.

25       189.    The knowing and active concealment of the material facts render the Products'

26   packaging deceptive, misleading, and unfair because without full disclosure, Plaintiffs and the

27   California Class believed the P&G Paper Products to be environmentally sustainable and to have

28   environmental benefits.

CLASS ACTION COMPLAINT – 69

011290-11/3201168 V1

Case No. _____

190.    P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the California Class with respect to the environmental and sustainability claims.

191.    P&G intended that Plaintiffs and the California Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

192.    P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiffs and the other California Class members to make their P&G Paper Products purchases. Plaintiffs were unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiffs and the other California Class members would not have purchased P&G Paper Products, or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other California Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

193.    Accordingly, P&G is liable to Plaintiffs and the other California Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

194.    P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other California Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the proposed Class, respectfully request that the Court enter judgment in their favor and against P&G, as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.    An order temporarily and permanently enjoining P&G from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged herein;

1    C.    Costs, restitution, damages, including punitive damages, and disgorgement in an
2    amount to be determined at trial;
3    D.    An order requiring P&G to pay both pre- and post-judgment interest on any
4    amounts awarded;
5    E.    An award of costs and attorneys' fees; and
6    F.    Such other or further relief as may be appropriate.
7                          **DEMAND FOR JURY TRIAL**
8    Plaintiff hereby demands a jury trial for all claims so triable.
9    DATED: May 28, 2025                    Respectfully submitted,
10
11                                          */s/ Ben M. Harrington*
                                           Ben M. Harrington (SBN 313877)
12                                          **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                           715 Hearst Avenue, Suite 300
13                                          Berkeley, CA 94710
                                           Telephone: (510) 725-3000
14                                          benh@hbsslaw.com
15                                          Catherine Y.N. Gannon*
                                           **HAGENS BERMAN SOBOL SHAPIRO LLP**
16                                          1301 Second Avenue, Suite 2000
                                           Seattle, WA 98101
17                                          Telephone: (206) 623-7292
                                           catherineg@hbsslaw.com
18
19                                          ***Attorneys for Plaintiffs and the Proposed Class***
20                                          * Pro hac vice application to be filed
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT – 71
011290-11/3201168 V1                                          Case No. _____